Renee FRASCA, By her parent and natural guardian, Lucille Frasca, Joan Falcetta, By her parent and natural guardian, Jean Falcetta, and all other persons similarly situated, Plaintiffs,

v.

Robert ANDREWS, Individually and in his capacity as Principal of Sewanhaka Central High School, W. Wallace Purdy, Individually and in his capacity as District Principal of the Sewanhaka Central High School District, Board of Education, Sewanhaka Central High School District, Defendants.

No. 78 C 1484.

United States District Court, E. D. New York.

Jan. 3, 1979.

As Amended March 5, 1979.

Alan J. Azzara, Youth Advocacy Project, Mineola, N. Y., for plaintiffs.

Robert B. Loew, Melville, N. Y., for defendants.

## MEMORANDUM AND ORDER

GEORGE C. PRATT, District Judge.

### INTRODUCTION

When plaintiffs commenced this action they moved by order to show cause for a preliminary injunction preventing defendants from barring distribution of one issue of a high school newspaper on the ground that defendants' actions in seizing the newspaper violated the First and Fourteenth Amendments. Declaratory relief, class action certification, and damages are also sought. Jurisdiction stems from 42 U.S.C. § 1983 and 28 U.S.C. §§ 1343, 2201. Oral argument was heard on plaintiffs' motion for a preliminary injunction on August 24, 1978. Because the essential facts are not in dispute, the action may be disposed of without an evidentiary hearing, and the trial on the merits is deemed to be advanced and consolidated with the preliminary injunction proceedings. FRCP 65(a)(2).

### PARTIES

Plaintiffs Renee Frasca and Joan Falcetta are, respectively, the former Editor-in-Chief and present Assistant Editor of the *Chieftain*, the official student newspaper of Sewanhaka High School, which is located in Floral Park, Nassau County, New York. The school contains grades 9–12 and has approximately 1,500 students, ranging in age from 13 to 21 years. The *Chieftain*'s editorial board and staff consists of 25 students.

Defendants in this action are: Robert Andrews, the building principal of Sewanhaka High School; W. Wallace Purdy, the district principal; and the Board of Education of Sewanhaka Central High School District.

## FACTS

Copies of the June 1978 issue of the *Chieftain* were returned to the school from the printer on the evening of June 14, 1978 and placed in the home room mail boxes in the school office for distribution on the following day, June 15, 1978, the last day of the school year. The next morning, the newspaper staff discovered that all copies of the June 1978 issue had been seized by the building principal, defendant Andrews, who prohibited their distribution. The bases for the seizure and the focal points of this suit were two letters printed in the paper and designated in the court documents as Exhibits "A" and "B".

Exhibit "A" appeared on page 8 of the *Chieftain* and read as follows:

Sports editor,

We, the Lacrosse players of Sewanhaka would like to know why you do not have any sports articles in the Chieftain. We would like a formal apology in public or else we will kick your greasy ass.

[signed] Pissed Off

S.H.S. Lacrosse Team.

The editor's response, printed immediately below, read:

We would like to reply by saying that the articles were stolen. We would also like to say that you hotheaded, egotistical, "Pissed Off" jocks of the Lacrosse team do not deserve an apology for anything. You should be giving one.

The Editors.

Exhibit "B", which appeared on page 2, criticized the conduct of a particular student who was then vice-president of the student government. The student will be referred to as "John" in this decision, as in the court papers, to protect him from further unnecessary embarrassment. The letter stated, *inter alia*, that John "has been a total failure in performing his duties" and is a "total disgrace to the school", that he had been suspended from school, that he did not maintain a high academic average, that he attended only a few of the many student council meetings, and that he had changed his report card grades "by typing over the letters on the computer terminal". It also stated that John had been given one major responsibility, to head the Interclub Council, but that the council "completely died" because John "never showed up for his own meetings". Although Exhibit "B" begins "as a group * * * we feel * * *", the paper does not identify either the author or the "group".

The *Chieftain* is an extra-curricular activity funded entirely by the local school district, which provides space, utilities, supplies, desks, typewriters, and printing. The paper is staffed solely by students, who primarily determine the content, management, and control of the newspaper. The district has no written policies, guidelines, or rules pertaining to the *Chieftain*'s content, or to possible prior review, restraint, or censorship by the faculty or administration. Nevertheless, defendants regard the newspaper as being under the jurisdiction and direction of the English Department's chairperson, and ultimately under the supervision and control of the Board of Education, administered through the district principal and the building principal. They consider the student editors and staff to be subject to supervision "in a manner consistent with sound educational practice".

Although the faculty advisor was generally familiar with the content of each issue of the *Chieftain* before it went to press, he denies ever having exercised a "prerogative of censorship" and states that it was not his practice to review the final draft of the paper before it went to press. Apparently, the absence of written regulations, policies and guidelines is intended to provide the staff with an atmosphere of free inquiry and expression.

The controversial June 1978 issue of the *Chieftain* was an "extra additional issue" for the end of the school year. While there is a factual dispute about whether the faculty advisor was given an opportunity to review the paper's content prior to publication, that factual issue is not material. It is undisputed that prior to press time the faculty advisor did not actually see Exhibits "A" and "B" or, indeed, any of the material in the paper.

Defendant Andrews first read the June 1978 issue on the morning of June 15, after copies had been placed in the homeroom mailboxes for distribution to the students. Andrews' personal acquaintance with members of the lacrosse team caused him to doubt "very much whether the team as a whole, or for that matter, even a majority of the team members would concur in and write such a letter". As to Exhibit "B", Andrews knew of his own knowledge that John was an excellent student, a senior, and that this was the last issue of the paper for the year. He recognized that John had no opportunity to defend himself and that, true or false, the letter would have a "devastating impact" upon him. Because he doubted the truth, both of the signature on Exhibit "A" and of the content of Exhibit "B", Andrews had all the papers removed from the mailboxes, thereby preventing their distribution, and immediately commenced an investigation.

With respect to Exhibit "A", purportedly a letter from the "SHS Lacrosse team", Andrews called in five members of the team, including two of the three captains. None had any knowledge of the contents of the letter or of who had written it. Neither did the team's coaches know of the letter's contents or origin. Later investigation by an assistant coach disclose that one member of the team had written the letter during his lunch hour, with three other team members present. No one else on the 25 man team had knowledge of the letter prior to or at the time it was written. As of June 15, the day the paper was to have been distributed, only four other players, and none of the team captains, knew of the letter.

Andrews' initial doubts about the letter focused on the falsity of representing it as a product of the entire lacrosse team. In his affidavit he also notes his concern that the "fighting words" of the letter might "easily trigger a physical as well as verbal confrontation between the lacrosse teams on the one hand, (we have three, freshman, JV and Varsity), and the staff of the *Chieftain* on the other". He expresses concern, too, over the "obscene" and vulgar language of Exhibit "A".

Andrews' investigation of Exhibit "B" was more extensive. He first spoke with the faculty director of student activities and learned that John had attended not "a few", but 75% of the student council meetings, and contrary to Exhibit "B", not only attended meetings of the Interclub Council but "tried his best to get the club functioning". John's records revealed that he ranked 101 out of a junior class of 557, and had no failing marks on his report card. Andrews knew that John had received an award from the senior high school Science Fair and was one of ten finalists for an Otis Elevator scholarship. Based on his investigation, Andrews determined that the content of Exhibit "B" was substantially false, and that if distributed on the last day of the school year with no offsetting response and no realistic opportunity to reply, great harm could be done to John and his reputation. Andrews was also concerned about possible liable liability of the school district, himself, and the staff members of the *Chieftain*, and about a possible violation of federal law by publishing information about a school suspension in a school newspaper.

Andrews spoke to the plaintiffs individually. Frasca indicated to him that she knew who had actually written the lacrosse team letter, but she "evaded" the question as to whether the letter had been authored by the team as a whole. With respect to Exhibit "B", Frasca told Andrews that she had reliable information that the letter's contents were true. Frasca's affidavit states that based on a discussion with the author as to his sources of information, and based on certain alleged eyewitnesses to the misconduct charged, "we [were] convinced of its truth".

In their brief, plaintiffs argue that Exhibit "B" is true and offer to prove its truth at a hearing. No factual support has been presented, however, to rebut the specific falsities pinpointed by defendants' affidavits. Exhibit "B" purports to be from a "group", yet in describing its preparation, Frasca refers only to a single individual as

"the letter's author" with whose consent she had revised the letter. While she claims to have spoken to individuals who claimed to be eyewitnesses to the misconduct alleged in the letter, she does not identify them, nor does she present any of their supporting affidavits. Moreover, plaintiff Falcetta told Andrews that John did not change his grade, but that someone else did.

As a result of his investigation, Andrews concluded that Exhibit "A" was false in that it was not authorized by the "SHS Lacrosse team", that certain words in the letter were obscene and vulgar and that, if published, the letter might provoke a physical as well as verbal confrontation between the lacrosse teams and the staff of the *Chieftain*. With respect to Exhibit "B", Andrews concluded that several of its statements were false and, in his opinion, libelous, that its publication would have a devastating impact on John, and that there would be no reasonable opportunity to reply. He ordered that the copies of the paper which had previously been removed from the homeroom mailboxes be destroyed, thereby preventing their distribution to the students. This suit followed.

## ISSUES

The parties agree that a high school newspaper is generally protected by the First Amendment. They disagree as to whether the June 1978 *Chieftain* enjoyed that protection. Plaintiffs argue that none of the recognized justifications for limiting first amendment rights apply here. They argue that Exhibit "A" was not "obscene", that it did not contain "fighting words", and that there was no reasonable basis on which Andrews could have concluded that distribution of Exhibit "A" would cause substantial, material, disruption of school activities.

Plaintiffs further argue that Exhibit "B" was not libelous, that its publication did not violate federal privacy laws, and that its publication could not be banned simply because it was anonymous. Further, plaintiffs argue that libel principles could not be applied to Exhibit "B" since it dealt with the vice-president of the student government who was a "public figure" within the meaning of *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and that there is no suggestion of malice. Finally, plaintiffs argue that without written policies, guidelines, or regulations, defendants had no power whatsoever to prevent distribution of the *Chieftain*.

Defendants stress that the incidents here arose in a special educational environment and, therefore, must be viewed in that context. They argue that Andrews' actions in prohibiting distribution of the *Chieftain*, were justified under constitutional principles, because Exhibit "A" was obscene and inflammatory, because Andrews had a reasonable expectation that Exhibit "A" would cause substantial disruption of, or material interference with, school activities and the rights of others, and because Exhibit "B" was libelous and contained confidential student information whose publication would violate family, educational, and privacy rights which are protected under 20 U.S.C. § 1232g. More generally, defendants argue that they have not only the right, but the duty, to restrain publication of obscene, libelous, inflammatory, or substantially disruptive materials proposed to be included in the school paper, that they may do so even in the absence of written policies, guidelines, or regulations, and that under the circumstances here, there was a rational basis for Andrews' decision to restrain publication. Finally, defendants argue that their good faith, under the circumstances, precludes any award of punitive damages or attorneys fees.

## DISCUSSION

An appropriate starting point for analysis is the Supreme Court's decision in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), a case involving an official ban on the wearing of black arm bands by public school students while on school premises. The court there held that such a prohibition of expression in the schools is

impermissible under the First and Fourteenth Amendments unless there is evidence that it is "necessary to avoid material and substantial interference with schoolwork or discipline * * *." *Id.* at 511, 89 S.Ct. at 739. The Court went on to state that

> * * * conduct by the student in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech. *Id.* at 513, 89 S.Ct. at 740.

The court added that prohibition or regulation of expression by students in schools would not be impermissible where school officials can "demonstrate any facts which might reasonably [lead] school authorities to forecast substantial disruption of or material interference with school activities * * *." *Id.* at 514, 89 S.Ct. at 740.

Although *Tinker* might be distinguished on its facts because it involved an expression of an opinion rather than restraint of a student publication, its test of "material and substantial" disruption has been utilized by many courts, including those in this circuit, in cases involving student publications. See, *e. g., Trachtman v. Anker,* 563 F.2d 512 (CA2 1977); *Eisner v. Stamford Board of Education,* 440 F.2d 803 (CA2 1971); *Bayer v. Kinzler,* 383 F.Supp. 1164 (E.D.N.Y.1974) *aff'd* 515 F.2d 504 (CA2 1975); *Baughman v. Freienmuth,* 478 F.2d 1345 (CA4 1973); *Quarterman v. Byrd,* 453 F.2d 54 (CA4 1971); *Shanley v. Northeast Independent School District, Bexar County, Texas,* 462 F.2d 960 (CA5 1972); *Scoville v. Board of Education of Jolliet,* 425 F.2d 10 (CA7 1970); *Gambino v. Fairfax County School Board,* 429 F.Supp. 731 (E.D.Va. 1977) *aff'd* 564 F.2d 157 (CA4 1977); *Pliscou v. Holtville Unified School District,* 411 F.Supp. 842 (S.D.Cal.1976).

Applying the *Tinker* standard, the Second Circuit has held that:

> * * * in order to justify restraints on secondary school publications, which are to be distributed within the confines of school property, school officials must bear the burden of demonstrating "a reasonable basis for interference with student speech, and * * * courts will not rest content with officials bare allegation that such a basis existed." *Eisner v. Stamford Board of Education,* 440 F.2d 803, 810 (2d Cir. 1971). At the same time, it is clear that school authorities need not wait for a potential harm to occur before taking protective action. *Trachtman v. Anker,* supra, 563 F.2d at 517.

*Trachtman* involved the attempted distribution of a sex questionnaire to high school students and planned publication of the results in a student newspaper. Affirming the district court's decision that the school officials had properly barred distribution of the questionnaire, the Second Circuit held that "the school authorities did not act unreasonably in deciding that the proposed questionnaire should not be distributed because of the probability that it would result in psychological harm to some students." *Id.* at 519. The court also said that:

> In determining the constitutionality of restrictions on student expression such as are involved here, it is not the function of the courts to reevaluate the wisdom of the actions of state officials charged with protecting the health and welfare of public school students. The inquiry of the district court should * * * [be] limited to determining whether defendants had demonstrated a substantial basis for their conclusion that distribution of the questionnaire would result in significant harm to some * * * students. *Id.*

[1] Before evaluating the circumstances of this case in light of the foregoing principles, we must consider plaintiff's categorical argument that absent written policies, guidelines, or regulations, defendants had no power whatsoever to exercise any prior restraint over publication of the *Chieftain.* All of the cases cited by plaintiff in support of this argument, *Eisner v. Stamford Board of Education,* 440 F.2d 803 (CA2 1971); *Shanley v. Northeast Independent School District,* 462 F.2d 960 (CA5 1972); *Baugh-*

man v. Freienmuth, 478 F.2d 1345 (CA2 1973); Quarterman v. Byrd, 453 F.2d 54 (CA4 1971), dealt with "underground" newspapers which, unlike the Chieftain, were not sponsored by the school district, not represented as a school newspaper, not financed in any way by public funds, and not in any way supervised by faculty members.

More significantly, each of those cases involved an attack upon a written school policy which required advance permission to distribute the underground newspaper. True, each case required that certain procedural standards be met in administering a program of review in advance of distribution, but none of them held that in the absence of a written policy, distribution of a school sponsored paper can not be prevented. Even assuming that the same protection must be accorded to a school newspaper as to an "underground" publication, the power of school officials in a proper case to prevent distribution within the school of material which is libelous, obscene, disruptive of school activities, or likely to create substantial disorder, or which invades the rights of others, does not disappear merely because the school board has failed to adopt written policies requiring review in advance of distribution. Written policies and guidelines undoubtedly have a pedagogical value; they probably help to avoid problems such as have arisen in this case, by offering to students a clearer indication of what is permitted and what is proscribed. In addition, when a prior restraint is actually imposed they enhance a sense of fairness and provide an opportunity for discussion, negotiation, and compromise in order to accommodate competing interests. All of that may be desirable, but is not required by the constitution.

In determining whether a school official's suppression of a particular newspaper is reasonable, all the circumstances must be evaluated, including whether or not written guidelines have been established for such action. Absent such guidelines, suppression of publication by school officials must, of course, be scrutinized more carefully than if the issue were presented to the court after guideline procedures had been pursued. To be consistent with the first amendment drastic post-publication suppression, particularly, as here, on the last day of school, should be permitted only when clearly justified.

Not all of the justifications offered by defendants can be accepted. Andrews' view that Exhibit "A" was obscene and vulgar is only half right, since terms such as "ass" and "pissed off", while certainly vulgar, fall far short, in this day and age, of the constitutional standard of obscenity. Nor does the court view the content of Exhibit "A" as rising to the level of "fighting words" within the meaning of Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

In connection with Exhibit "B", the court finds no merit in defendants' reliance upon the so-called "Buckley amendment" part of which, 20 U.S.C. § 1232g, prevents disclosure by a school district of certain information about students which is deemed to be confidential. Although some of the information in Exhibit "B" would fall within the scope of the Buckley amendment if the source of that information had been school records, the prohibitions of the amendment cannot be deemed to extend to information which is derived from a source independent of school records. Even though a school suspension is listed in protected records, as in the present case, the suspension would also be known by members of the school community through conversation and personal contact. Congress could not have constitutionally prohibited comment on, or discussion of, facts about a student which were learned independently of his school records.

The other justifications offered by defendants, however, have greater merit. Although it might be argued that any disruption of school activities caused by publication of a newspaper on the last day before a two month summer holiday could not be "substantial" by reason of the short period of time in which its effect would be felt,

the court does not interpret *Tinker* to require that "substantial disorder" be expected to continue for any particular length of time.

Three school officials expressed concern over the possibility that one or more of the school's lacrosse players might have taken literally the threat of violence expressed in Exhibit "A". Defendant Andrews, the building principal, referred to the possibility that:

an impressionable 14 year old member of the freshman Lacrosse team [might] take the letter as a license to hunt up the sports editor for the stated purpose of the letter. Andrews' Aff. ¶ 11.

Assistant lacrosse coach Flatley stated that:

In my opinion, such a letter could create an inharmonious relationship between the students engaged in the publication of the *Chieftain* on the one hand and the members of the lacrosse teams on the other, and could easily generate into a physically disruptive and verbally abusive situation within the school between the two factions without serving any public or educational benefit to anyone. Flatley Aff. ¶ 7.

The *Chieftain*'s faculty adviser, George Doolittle, an English teacher of 27 years' experience, said that:

some members of the student body could and would take this letter literally and the letter foreseeably could provoke a confrontation between athletes on one hand, and the staff members of *The Chieftain* on the other. This letter could very well culminate in a physical confrontation between members of the two groups. Doolittle Aff. ¶ 110.

Mr. Doolittle, in addition, offered the insight that some members of the lacrosse team might well object to having had an offensive letter such as Exhibit "A" falsely attributed to them.

In light of such opinions, offered by professionals having extensive experience with students of comparable age and maturity, and having specific acquaintance with members of the editorial staff and lacrosse teams, the court is satisfied that defendant Andrews had a rational basis grounded in fact for his conclusion that publication would create a substantial risk of disruption of school activities.

As stated by the Second Circuit in *Trachtman*:

* * * we do not think defendants' inability to predict with certainty that a certain number of students in all grades would be harmed should mean that defendants are without power to protect students against a foreseen harm. We believe that the school authorities are sufficiently experienced and knowledgeable concerning these matters, which have been entrusted to them by the community; a federal court ought not to impose its own views in such matters where there is a rational basis for the decisions and actions of the school authorities. See *Eisner v. Stamford Board of Education, supra,* 440 F.2d 810; *Butts v. Dallas Independent School District,* 436 F.2d 728, 732 (5th Cir. 1971). *Trachtman v. Anker, supra,* at 519.

In opposition, plaintiffs argue that the staff of the *Chieftain* had already seen the letter purporting to be from the "SHS Lacrosse Team" and that no arguments or violence had ensued. The argument ignores, however, the obvious facts that the lacrosse team (a) had not yet seen the letter, (b) had not seen the published reply of "the editors", and (c) might well be viewed as more likely to express their feelings physically than would less athletic staff members of the *Chieftain*.

An additional factor highlighted by Doolittle's affidavit is the potential impact of this falsely attributed epistle on non-assenting team members. To have authored such a document bespeaks to many not only crudity and bad taste, but an immature preoccupation with violence as a solution to relatively trivial disputes. Thus, for non-assenting team members Exhibit "A" created an unfair potential of harm to personal relationships and individual reputations, whose impact would only be aggravated by

the lack of any meaningful opportunity to disclaim or explain the letter to the same audience who would have received it initially.

■ The remaining problem, Exhibit "B", focuses upon defendant Andrews' reasoned and supported conviction that its content was substantially false, would have a devastating impact on John, and would leave John without any reasonable opportunity to respond, correct, or explain. Based upon his prompt investigation, personal knowledge of the student, and the virtually certain irreparable harm which would result from the letter, defendant Andrews had a rational and substantial basis for preventing its publication.

Plaintiffs have asserted in conclusory fashion that the content of the letter is true, and they seek now to prove its truth on the theory that truth is a complete defense to any claim of libel. A factual hearing into the truth or falsity of the statements would, of course, involve further unnecessary exposure of John to the publicity already generated by these plaintiffs. That fact alone, however, if necessary to a determination of the issues here, would not deter the court. But, even assuming that the statements contained in Exhibit "B" were to be found true after a trial, all such a finding would establish would be that Andrews had erred when, under the time pressure of the day and with inadequate information supplied to him by plaintiffs, he determined that there was a reasonable and substantial basis to conclude that the letter's content was not only damaging, but false.

■ Since the disputes which arise in the day-to-day operations of our public schools cannot as a general rule be resolved by federal district judges, who necessarily must view them after the fact, from a remote point of view, and without direct responsibility for the immediate and practical consequences of the determinations, the rule has been wisely established that decisions of school officials will be sustained, even in a First Amendment context, when, on the facts before them at the time of the conduct which is challenged, there was a substantial and reasonable basis for the action taken. *Trachtman v. Anker, supra.* Because there was such a basis to support Andrews' determination here, there is no basis for court intervention.

■ Plaintiff's final argument with respect to the libel implications of Exhibit "B" focuses upon John's position as vice-president of the student government. From this, plaintiffs argue that John was a "public figure" within the meaning of *New York Times v. Sullivan, supra,* and that since there is no suggestion of malice, there could be no libel. As important as an unrestrained press may be to the furtherance of our democratic government and society, the "public figure" exception to libel liability ought not to be extended to the level of a high school newspaper editor's comments about a fellow student. Significant here is the educational function, not only of the school newspaper, but also of the student government and every other activity carried on in the school. Part of the educational process is to learn in a protected environment where one's mistakes do not have damaging or irrevocable consequences. For the law to place a high school member of the student government organization in the same withering spotlight of the press as it does our publicly elected officials, would serve neither the policies of the First Amendment nor the democratic principles it seeks to further. Even if the *New York Times v. Sullivan* principle were to be applied here, thereby insulating the individual defendants, the school district, and the editorial staff from a possible damage judgment for publishing Exhibit "B", Andrews' suppression of the article under the circumstances that faced him on June 15, 1978, knowing the harm that would be done without any reasonable opportunity to mitigate or correct it if wrong, was a rational, reasonable decision made on the basis of substantial evidence before him at the time.

Accordingly, plaintiffs' motion for a preliminary injunction is denied, and the complaint is dismissed.

SO ORDERED.