Charles E. REINEKE, Plaintiff,

v.

COBB COUNTY SCHOOL DISTRICT; T. J. Hatcher, Individually and in his official capacity as Principal of McEachern High School; and Jan B. Protteau, Individually and in his official capacity as a faculty member of McEachern High School, Defendants.

Civ. A. No. C79–2157A.

United States District Court,
N. D. Georgia,
Atlanta Division.

Feb. 21, 1980.

William E. Hoffmann, Jr., Trotter, Bondurant, Griffin, Miller & Hishon, Atlanta, Ga., for plaintiff.

Robert D. Feagin, Katharine C. Robey, Atlanta, Ga., for defendants.

## MEMORANDUM AND ORDER

TIDWELL, District Judge.

This is an action for injunctive relief and a declaratory judgment brought on behalf of the plaintiff, Charles E. Reineke, by his father as next friend, seeking to enjoin the defendants from engaging in certain alleged acts of censorship and control over *The McEachern Arrowhead* (hereinafter, "the *Arrowhead*" or "the newspaper"). The *Arrowhead* was a monthly newspaper written, edited, and published by certain students at McEachern High School. Its publication has currently been suspended. The plaintiff was the co-editor-in-chief. The newspaper was printed at a private printing company and was sold on the campus of McEachern High. Some financial support was provided by the high school, but most funding was derived from advertising and sales of individual copies. The student editors and staff of the *Arrowhead* were enrolled in a journalism class at McEachern for which they received academic credit. The teacher of the journalism class served as the faculty advisor to the newspaper.

McEachern High School is a public high school within the Cobb County School District and receives public funds for its operation. The Cobb School District is a political subdivision of the State of Georgia, controlled and governed by the Cobb County School Board. Defendant Hatcher is the principal of McEachern High School and is an employee of the Cobb County School Board. Defendant Protteau is a faculty member of McEachern High School whose duties for the 1979–80 school year included teaching the journalism class and serving as the faculty advisor for *The McEachern Arrowhead.*

This action seeks a mandatory injunction ordering the defendants to reinstate publication of the newspaper, to allow the plaintiff to publish certain material in the *Arrowhead*, and to allow distribution on the McEachern High School Campus of those copies of the *Arrowhead* containing such material. The matter is presently before the court on the plaintiff's motion for a preliminary injunction and the defendants' response thereto, as well as the plaintiff's motion to strike certain of the defendants' affidavits submitted in opposition to the motion for preliminary injunction.

## FACTS

The parties have submitted numerous briefs and affidavits in support of their respective positions. Basically, four acts of censorship have been alleged. After the September 27, 1979 edition of the *Arrowhead* was returned from the printer, it was distributed to the journalism class that was responsible for publishing the newspaper. At this time, the plaintiff noticed that several changes had been made to the issue. In an article entitled "New Teachers at McEachern", a paragraph dealing with the new teachers' general attitudes toward homosexual teachers had been deleted. In addition, the word "darn" had been substituted for the word "damn" in a quote attributed to a local radio personality. These changes were admittedly made by the faculty advisor while the September 27 edition was still at the printer, and constitute the first act of censorship alleged by the plaintiff.

On the following morning, the students began selling the newspaper. Shortly thereafter, the principal ordered the distribution stopped, and requested the return of all copies that had already been sold. The principal had several objections to the content of the September edition of the *Arrowhead.* He thought that photographs had been used from other publications without permission, authority, or waiver of copyright; that an article entitled "Vietnam Syndrome" was in poor taste and possibly libelous; that an article regarding ticket prices to high school football games contained erroneous statistics; that an article

concerning the student body president was a personal attack upon that student; that an article entitled "Advertising Metamorphoris" [sic], which quoted the 1960 segregationist stance of a current member of the Cobb County Board of Education, would adversely affect racial relationships at the high school; and that a purported letter to the editor signed "D. Newburn" would be falsely attributed to the student chaplain, Danny Newburn, and would cause a disruption of school activities. The principal also noted that there were a number of technical defects in the newspaper in grammar and spelling. The confiscation of the September 27 edition in its entirety is the second act of censorship alleged by the plaintiff.

Several weeks thereafter, the second issue of the Arrowhead for the 1979–80 school year was published and distributed as scheduled. However, two articles in this October edition were deleted by the faculty advisor while the newspaper was at the printer. One was a story about the high school football team, written by the team's manager, who also served as the student sports editor. The faculty advisor objected to this article on the ground that it constituted inappropriate editorializing on the sports page. The other story that was deleted concerned the confiscation of the September issue. These actions by the faculty advisor constitute the third alleged act of censorship.

By letter dated October 30, 1979, an attorney retained by the plaintiff contacted the school principal and advised him that the aforementioned actions constituted censorship of the school newspaper in violation of his client's First Amendment rights. Subsequently, the principal suspended further publication of the Arrowhead, pending termination of the threatened litigation. A literary magazine was substituted as an alternative means of student expression. This suspension of publication constitutes the fourth act of alleged censorship.

## DISCUSSION

### I.

The court will first address the plaintiff's motion to strike three affidavits which have been submitted by the defendants in this action: the Affidavit of Students; the Affidavit of Staff; and the Affidavit of Linda Charles. The plaintiff has objected to these affidavits on the grounds that the affiants, not having read the newspaper articles in question, do not have personal knowledge of the subject matter of their testimony, thereby violating Rule 602, Federal Rules of Evidence; that the affidavits are inadmissible opinion evidence by non-experts; and that the affidavits are unreliable on their face.

The affidavits in question state that the affiants have "learned" of the contents of the controversial articles in the September issue of the Arrowhead, thus indicating that they have personal knowledge of their contents. Moreover, the affidavits of the students and staff state, in part, that the publication of these articles "did materially disrupt class work, involved substantial disorder and invasion of rights of others", and this assertion does not involve the expression of an opinion. (The plaintiff has conceded that a teacher, such as Linda Charles, may qualify as an expert for the purpose of rendering opinion evidence in this type of case. The court agrees.) Finally, the plaintiff's third argument goes to the weight, and not the admissibility, of the affidavits. Accordingly, the plaintiff's motion to strike the aforementioned affidavits is hereby overruled and denied.

### II.

A logical starting point when discussing student First Amendment rights is the landmark case of Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), which concerned a public school policy forbidding the wearing of black armbands by students in protest of the Vietnam war. While affirming the comprehensive authority of school officials to prescribe and control conduct in the nation's schools, the Supreme Court emphasized that neither students nor teachers "shed their constitution-

al rights to freedom of speech or expression at the schoolhouse gate." 393 U.S. at 506, 89 S.Ct. at 736. The Court held that a prohibition of expression in a school setting such as that involved in *Tinker* was impermissible under the First and Fourteenth Amendments, unless there was evidence that it was "necessary to avoid material and substantial interference with schoolwork or discipline . . . ." 393 U.S. at 511, 89 S.Ct. at 739. In formulating this standard, the Supreme Court embraced the reasoning of the Fifth Circuit in *Burnside v. Byars*, 363 F.2d 744 (5th Cir. 1966). In that case, the Court of Appeals had reversed the denial of a preliminary injunction which had been sought to prevent high school authorities from enforcing a regulation prohibiting students from wearing civil rights "freedom buttons." The Fifth Circuit held that school officials could not infringe on students' First Amendment rights unless the exercise of such rights "materially and substantially interfere[d] with the requirements of appropriate discipline in the operation of the school." 363 F.2d at 749. The Supreme Court in *Tinker* approved the *Burnside* holding, but further cautioned that

> . . . conduct by the student, in class or out of it, which for any reason— whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech.

393 U.S. at 513, 89 S.Ct. at 740.

The *Tinker* standard of material and substantial disruption has been applied by numerous courts, including those in this circuit, in cases involving student publications. See cases cited in *Frasca v. Andrews*, 463 F.Supp. 1043, 1049 (E.D.N.Y.1979). In *Shanley v. Northeast Independent School District, Bexar County, Texas*, 462 F.2d 960 (5th Cir. 1972), the Fifth Circuit Court of Appeals summarized the decisional implications of *Tinker* and its progeny as follows:

> . . . (1) expression by high school students can be prohibited altogether if it materially and substantially interferes with school activities or with the rights of other students or teachers, or if the school administration can demonstrate reasonable cause to believe that the expression would engender such material and substantial interference; (2) expression by high school students cannot be prohibited solely because other students, teachers, administrators, or parents may disagree with its content; (3) efforts at expression by high school students may be subjected to prior screening under clear and reasonable regulations; and (4) expression by high school students may be limited in manner, place, or time by means of reasonable and equally-applied regulations.

462 F.2d at 970.

There is a "heavy burden" on the defendants to justify their actions where they constitute a prior restraint. *See Healy v. James*, 408 U.S. 169, 184, 92 S.Ct. 2338, 2347, 33 L.Ed.2d 266 (1972); *Shanley, supra*, 462 F.2d at 969. The primary issue is whether the school officials can demonstrate reasonable cause to believe that the prohibited expression would have engendered material and substantial interference with school activities or with the rights of others. It is clear that school administrators need not await the occurrence of actual disruption before exercising reasonable restraint over a student publication. *Butts v. Dallas Independent School District*, 436 F.2d 728, 731 (5th Cir. 1971). However, mere "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker, supra*, 393 U.S. at 508, 89 S.Ct. at 737. As the Fifth Circuit stated in *Butts, supra* :

> . . . [W]e do not agree that the precedential value of the *Tinker* decision is nullified whenever a school system is confronted with disruptive activities or the possibility of them. Rather we believe that the Supreme Court has declared a constitutional right which school authorities must nurture and protect, not extinguish, unless they find the circumstances allow them no practical alterna-

tive. As to the existence of such circumstances, they are the judges, and if within the range where reasonable minds may differ, their decisions will govern. But there must be some inquiry, *and establishment of substantial fact,* to buttress the determination.

436 F.2d at 732 (emphasis added).

### III.

■ Turning to the circumstances of the case at bar, the defendants have attempted to justify the first act of alleged censorship on several grounds. The faculty advisor claims that the printer had recommended the elimination of one or more paragraphs of the story, "New Teachers at McEachern", in order to improve the appearance of the page. The faculty advisor deleted the paragraph concerning new teachers' attitudes about homosexual teachers (which is reprinted as Appendix "A" to this Order), since he felt that it "did not fit in with the rest of the story and because the writer, Jennifer Dehart, had also felt that it did not fit." Protteau Affidavit, ¶ 10.

The faculty advisor was also responsible for substituting the word "darn" for the word "damn" in another article about a local radio personality. The faculty advisor maintains that he took this action in view of Cobb County School Board regulations that prohibit the use on campus of obscenities or vulgar language. He also felt that it would have caused a disruption among conservative and religious students and their parents.

The court finds that these justifications, even though made in good faith, fail to satisfy the legal standards expressed in *Tinker* and *Shanley, supra.* To allow the faculty advisor to excise possibly controversial material in the name of improving an article's appearance would too easily allow a circumvention of the *Shanley* rule that student expression may not be prohibited solely because of disagreement with its content. It is also inconceivable that the use of the word "damn" one time in the newspaper would have caused material and substantial interference with school activities.

The actions of the faculty advisor cannot be sustained.

### IV.

■ The most serious allegation of censorship concerns the confiscation of the entire September edition of the *Arrowhead.* The defendants have sought to justify their actions in this regard on numerous grounds. The school principal expressed concern that the use of photographs from other publications without permission might have exposed the school to a suit for copyright infringement. Although this may have been a sufficient reason to delay distribution of the *Arrowhead* for a few days until competent legal advice was obtained on the matter, the court cannot conclude that it justified a total suppression of the newspaper.

The principal also felt that an article entitled "Vietnam Syndrome" might be libelous. Although the article may be in poor taste, it clearly does not rise to the level of actionable libel under the standard set forth in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1963). Again, had the principal merely delayed distribution of the *Arrowhead* while legal counsel was consulted, there would be no objection to his conduct. However, total suppression of the newspaper was not justified.

■ The principal also noted that an article regarding ticket prices to McEachern High football games contained statistics which were in error. In addition, the Chairman of the English Department pointed out a number of technical defects in the newspaper in grammar and spelling. These reasons are clearly insufficient to permit the school administration to infringe upon students' free speech, for these faults are not the sort which would lead to a significant disruption of the educational process. *See Schiff v. Williams,* 519 F.2d 257 (5th Cir. 1975).

The defendants have most closely approached the legal standard which justifies the prohibition of student expression in

their assertion that the publication of certain articles in the September edition would have resulted in a substantial disturbance and disruption of student activities at McEachern High. One such article was entitled "Council Activities," and the defendants have alleged that it would have caused a substantial disturbance because it was critical of the student body president. They have also alleged that the article was a personal attack on that student, and thus constituted an "invasion of the rights of others" which has no constitutional protection under *Tinker, supra*, 393 U.S. at 513, 89 S.Ct. at 740.

■ The court is unable to discern any reason why the publication of this article would have led to a substantial interference with educational activities. It is the court's conclusion, after considering all of the evidence before it, that the article's appearance would have, at most, provoked discussion and comment among the students at McEachern. Perhaps some students would have found the statements which the plaintiff made at the Student Council meeting and which were reported in the article to be controversial. But as was stated in *Shanley, supra*, 462 F.2d at 971, "it should be axiomatic at this point in our nation's history that in a democracy 'controversy' is, as a matter of constitutional law, never sufficient in and of itself to stifle the views of any citizen . . . ." It may also be true that the majority of students would have supported the opposing views of the student body president (which were also reported in the article), since he had been overwhelmingly elected by a 95% vote of the students. Be that as it may, it has been stated that in the context of student publications, "speech cannot be stifled by the state merely because it would perhaps draw an adverse reaction from the majority of people . . . ." *Bazaar v. Fortune*, 476 F.2d 570, 579, *rehearing en banc*, 489 F.2d 225 (5th Cir. 1973).

■ Nor is the court able to comprehend the manner in which the article in question constitutes a personal attack upon the student body president. Although the story reports a dispute which occurred at a Student Council meeting with regard to the powers of the officers to assess dues, it does not vilify or ridicule the president, nor does it in any way attack his reputation or character. As such, the article is quite different in nature from the material involved in *Frasca v. Andrews*, 463 F.Supp. 1043 (E.D. N.Y.1979), which the defendants have cited in support of their position. In *Frasca*, the post-publication seizure of a high school newspaper was upheld, in part, on the ground that it contained an unsigned letter criticizing the vice-president of the student government. The letter stated, *inter alia*, that the student in question had "been a total failure in performing his duties" and was a "total disgrace to the school", that he did not maintain a high academic average, that he attended only a few of many student council meetings, and that he had changed his report card grades "by typing over the letters on the computer terminal." 463 F.Supp. at 1046. There is nothing in the "Council Activities" article presently before the court that even remotely resembles the type of personal attack found in the *Frasca* letter. Moreover, in the New York case, the newspaper was to have been distributed on the last day of the school year, thus allowing no opportunity for rebuttal on the part of the student who was the subject of the letter. Under those circumstances, it could well be said that based upon "the virtually certain irreparable harm which would result from the letter, . . . [there was] a rational and substantial basis for preventing its publication." *Frasca, supra*, 463 F.Supp. at 1052. Such was not the case here.

■ The defendants also objected to a fictitious "Letters" column, and were particularly concerned with a letter attributed to "D. Newburn" from "McEachern, GA", which reads, in full, as follows:

I've been hearing a lot about a School Spirit. I don't know about everyone else, but I'm scared to death about spirits. Shouldn't we call an Exorcist or something?

The student chaplain at McEachern High School is named Danny Newburn. Because the McEachern student body is generally religious and conservative, the principal felt that this letter would cause a disturbance and disruption if published. The court concludes, however, that the principal's good faith belief amounted to no more than an "undifferentiated fear or apprehension of disturbance," which *Tinker, supra,* instructs us "is not enough to overcome the right to freedom of expression." 393 U.S. at 508, 89 S.Ct. at 737. In the absence of additional, compelling evidence, it was unreasonable to equate the possibility of controversy or adverse reaction with a substantial likelihood of disruption. Moreover, the letter itself seems innocuous enough. If the student chaplain had felt that his rights had been invaded in any way by its content, then a less restrictive solution would have been to require a retraction or an apology to be printed in the following issue.

 The final allegation by the defendants concerning the September issue is that the article entitled "Advertising Metamorphoris" [*sic*] would have adversely affected racial relations at McEachern High School and caused a substantial disruption of student activities due to increased racial tensions. The article quotes a 1960 political advertisement from the *Marietta Daily Journal* which states "W. O. Smitha will provide leadership to keep our schools on a segregated basis. He knows it to be in the best interest to educate the white children apart from the colored." The court concludes that there was no reasonable basis to forecast that the publication of this material would cause a significant and material disruption at McEachern High. By all accounts, racial relations at the high school are good. The principal termed them "very good," while another of defendants' affiants, a black teacher, thinks they are "excellent." Hatcher Affidavit, ¶ 10; Charles Affidavit, ¶ 5. Of the seventeen hundred students at McEachern, only approximately 100 are black. Yet the student body president, who is black, was overwhelmingly elected by a 95% vote of the entire student body. (Thus the case at bar

is distinguishable from *Augustus v. School Board of Escambia County,* 507 F.2d 152 (5th Cir. 1975), cited by the defendants in their briefs, where some restrictions on student First Amendment rights were upheld against the background of continuing violence and racial unrest at a Florida high school.) There is no reason to believe that the article in question will destroy this harmonious atmosphere. In addition, suppression of the September *Arrowhead* was not justified on the ground that this material was potentially libelous, for the same reasons heretofore expressed regarding the "Vietnam Syndrome" article.

## V.

 The third act of alleged censorship concerns the deletion of two articles from the October 16 issue of the newspaper, which was distributed to the student body as scheduled. The faculty advisor admittedly removed an article on the football team "because it was not in a proper journalistic form for publication on the sports page." Protteau Affidavit, ¶ 24. Although the text of the proposed article is not before the court, the stated justification for its removal again too closely resembles censorship of content in the guise of correcting technical defects, a practice which has been disapproved as violative of freedom of expression. *See Schiff, supra.* The other article that was removed is set out as Appendix "B" to this Order and concerns the confiscation of the first issue of the *Arrowhead.* The faculty advisor states that he removed this article "because the story had received extensive coverage in the Atlanta and Marietta newspapers and because reporting on it would have reopened all the antagonism, disturbance, and interference with school activities caused and threatened by the issue when it was shown to the [journalism] class and selected students." Protteau Affidavit, ¶ 25. The court has read the article in question and finds that it is straightforward news reporting of an incident which would be of no small importance to the faculty and students at McEachern High. The court concludes that there

was no reasonable basis for the faculty advisor to predict that a substantial disruption of school activities would be caused by its publication.

## VI.

 The fourth act of alleged censorship occurred when the principal decided to discontinue the newspaper because litigation had been threatened. A literary magazine was substituted instead. The court fails to understand how the plaintiff's actions in resorting to the courts in an attempt to vindicate his First Amendment rights would justify a further abridgement of those rights by the school authorities. The principal has also alleged that the *Arrowhead* was financially insolvent and unable to meet its bills due to insufficient advertising revenues. However, it appears that the major cause of the loss of advertising revenue was the confiscation of the September issue, since ads that had been previously sold had to be run in the October issue at no charge. The defendants cannot justify their suspension of the newspaper on the basis of a financial crisis for which they, themselves, were responsible. The defendants have also claimed that no additional school funds are available for the *Arrowhead*. This is no defense. If necessary, the funding must be provided by the defendants from sources otherwise available. As was stated in *Joyner v. Whiting*, 477 F.2d 456 (4th Cir. 1973):

> The principles reaffirmed in *Healy v. James, supra* have been extensively applied to strike down every form of censorship of student publications at state-supported institutions. Censorship of constitutionally protected expression cannot be imposed by suspending the editors, suppressing circulation, requiring imprimatur of controversial articles, excising repugnant material, withdrawing financial support, or asserting any other form of censorial oversight based on the institution's power of the purse.

477 F.2d at 460 (footnotes omitted).

The *Arrowhead*'s current financial status does not preclude the relief sought in the present case.

## VII.

 Additional arguments made by the defendants are also unpersuasive. Although the evidence shows that the distribution of the September issue of the *Arrowhead* to the journalism class responsible for its publication resulted in discussion and comment, and some controversy, this was not necessarily contrary to the educational process in that class. It is clear that class activities were not substantially disrupted, for the students accomplished their intended task of readying the newspaper for distribution the following day. Apparently, some students raised questions about why their articles were not published, why a certain individual's name was not included on the masthead, whether certain articles had been substituted for others, and whether one story's by-line was correct. These were primarily journalistic concerns regarding the manner in which the newspaper had been compiled, and such problems could have been settled within the framework of the journalism class itself. It was unreasonable for the defendants to base a forecast of material and substantial disruption among the student body as a whole upon a controversy which occurred among the newspaper staff concerning journalistic matters.

## REQUIREMENTS FOR A PRELIMINARY INJUNCTION

 In order to be entitled to a preliminary injunction, the plaintiff must be able to show the following: (1) a substantial likelihood that he will prevail on the merits; (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to him outweighs the potential harm that the injunction may inflict on the defendants; and (4) that the public interest will not be harmed by granting the injunction. *Hillsboro News Co. v. Tampa*, 544 F.2d 860 (5th Cir. 1977).

 Before examining these factors, the court notes that the defendants have raised

the equitable defense of plaintiff's unclean hands, relying on *Sullivan v. Houston Independent School District*, 475 F.2d 1071 (5th Cir. 1973). The defendants claim that the plaintiff personally dominated the newspaper, arbitrarily rejected articles prepared by other students, failed to run or altered advertisements, and was rude and disrespectful to the faculty advisor. After considering the evidence, the court declines to accept all of the defendants' contentions in this regard. In any event, the defendants' allegations fall far short of the situation described in *Sullivan, supra*, 475 F.2d at 1076, where the Fifth Circuit held that a student's "flagrant disregard of established school regulations, his open and repeated defiance of the principal's request [to cease selling a certain underground newspaper], and his resort to profane epithet" precluded equitable relief. By way of contrast, the plaintiff in the present case has sought to challenge the defendants' actions in an orderly manner by resorting to the courts, and the most serious example of disrespectfulness that the defendants have cited was the plaintiff's telling the faculty advisor that he was "crazy" to want to change the *Arrowhead*'s printer. Without condoning such behavior, the court concludes that the plaintiff is not precluded from obtaining equitable relief on the basis of unclean hands.

■ Based on the foregoing analysis and a consideration of all the evidence before it, the court finds that the plaintiff has shown a strong likelihood of prevailing on the merits in this action. Moreover, the plaintiff, who was appointed as co-editor-in-chief of the *Arrowhead* for the 1979–80 school year, is suffering irreparable harm in being deprived of his editorial position. The newspaper was intended to be a learning experience for those students interested in journalism. This educational opportunity has been suspended. In addition, the students are being denied the right to disseminate and receive the information that would have been published in the newspaper. Under these circumstances, the court concludes that irreparable injury has been adequately demonstrated.

The court also finds that the benefits to the plaintiff arising from the issuance of a preliminary injunction are not outweighed by the harm to the other parties, since it is apparent that the defendants will not suffer any harm if the material in question is published and distributed. Finally, the public interest will not be harmed by granting the injunction. On the contrary, the vindication of First Amendment rights is in the public interest. This is especially true in the present situation, since "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960). For all of the foregoing reasons, the court concludes that a preliminary injunction should issue.

### ORDER

■ IT IS HEREBY ORDERED that the defendants, individually and in their official capacities, and their officers, agents, servants, employees, and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise (hereinafter collectively referred to as "Defendants and their agents"), be preliminarily restrained and enjoined from:

A. Prohibiting or interfering with the distribution of the September 27, 1979 edition of *The McEachern Arrowhead* or any material contained therein;

B. Prohibiting or interfering with the publication and distribution of an issue or issues of *The McEachern Arrowhead* containing any of the following material:

(1) the occasional use of the word "damn";

(2) the paragraph describing the attitudes of new teachers at McEachern High School toward homosexual teachers, which is attached as Appendix "A" to this Order;

(3) the article explaining why the September 27 edition of the *Arrowhead* was not distributed as scheduled, which article is attached as Appendix "B" to this Order;

C. Engaging in prior restraint of the *Arrowhead* by any means including but not limited to cutting off funds from or terminating the existence of the *Arrowhead*, censoring material in or from an issue of the *Arrowhead*, prohibiting or interfering with the distribution of an issue of the *Arrowhead*, or ordering any editor or staff member not to publish material in an issue of the *Arrowhead*, unless the material censored by one of the above described means or otherwise is one of the following:

(1) Obscene as to minors aged fourteen through eighteen, as defined in accordance with applicable legal standards;

(2) Libelous, as defined in accordance with applicable legal standards; or

(3) Material which Defendants and their agents could reasonably forecast would cause substantial disruption of or material interference with school activities or material interference with the rights of other students or faculty, and which disruption and interference cannot be controlled or prevented by means other than censoring the material;

D. Denying any rights or privileges to the Plaintiff because of the activity of the Plaintiff in connection with this litigation; or disciplining the Plaintiff for any action taken by the Plaintiff prior to the date of this Order in connection with publication of the *Arrowhead*, unless the Plaintiff is first afforded a proper hearing.

IT IS FURTHER ORDERED that the Defendants and their agents:

E. Immediately release, for purpose of sale and distribution, all copies of the September 27, 1979 edition of the *Arrowhead* in their possession, custody, or control, except that Defendants and their agents may retain no more than twenty (20) copies of the September edition;

F. Immediately reinstate the *Arrowhead* as the newspaper of McEachern High School;

G. Immediately reinstate the Plaintiff as co-editor-in-chief of the *Arrowhead*;

H. Effective March 10, 1980, at the beginning of the next school quarter, reinstate the journalism class having as class members the editors and staff of the *Arrowhead* and having as one of the class activities the monthly publication of the *Arrowhead*.

The court points out that no procedures are presently in effect at McEachern High School which would provide guidelines with respect to the prior screening of student expression. While expressing no opinion as to whether the promulgation of publication policy regulations should be undertaken by the school authorities, the court notes that none exist at the present time.

This Order shall remain in force and effect until further Order by this court or until June, 1981, whichever is earlier.

## APPENDIX "A"

How do these teachers feel about homosexual teachers? The reaction varies. "I would not want my children to have a homosexual teacher, homosexuality goes against my religion." "Sexuality is private, unless it interferes with teaching." "Homosexuals should be able to teach without prejudice, but not impress their sexual views."

## APPENDIX "B"

### Confiscation of Issue One

Issue One of the Arrowhead for this year was printed, but the copies of the newspaper were confiscated by Principal T. J. Hatcher on the date scheduled for publication.

In a meeting with Arrowhead Editors, Hatcher said that he principally objected to an article quoting a school board member's segregationist stance in a 1960 election. He also objected to the overall "negative attitude" of the paper.

The incident received considerable newspaper attention and articles appeared in the Cobb Extra, the Atlanta Journal and The Marietta Daily Journal, and editorials by Lewis Grizzard and Richard Matthews were in the Atlanta Journal and Constitution, respectively, favoring the editors of the Arrowhead.