607 F.Supp. 1450 (1985)
Cathy KUHLMEIER, Leslie Smart, Leanne Tippett, Plaintiffs,
v.
HAZELWOOD SCHOOL DISTRICT, Charles Sweeney, Joseph Donahue, Gwen Gerhardt, August Busch, Jr., Ann Gibbons, James Arnac, Dr. Thomas Lawson, Robert Eugene Reynolds, Howard Emerson and Dr. Francis Huss, Defendants.
No. 83-2039C(1).
United States District Court, E.D. Missouri, E.D.
May 9, 1985.
Leslie D. Edwards, B. Stephen Miller, III, American Civil Liberties Union, St. Louis, Mo., for plaintiffs.
Robert P. Baine, Jr., Susan E. Kaiser, St. Louis, Mo., for all defendants.

MEMORANDUM
NANGLE, Chief Judge.
This is a civil rights action for declaratory relief and damages arising from defendants' refusal to permit publication of certain articles in the May 13, 1983, issue of Spectrum, a school newspaper published at Hazelwood East High School in St. Louis County, Missouri.[1] Because the factual disputes in this case are inextricably intertwined with the central legal issue in this case, namely the extent of plaintiffs' first amendment right of expression as student members of Spectrum, this Court held on November 8, 1984, that the declaratory relief and liability questions should be heard by this Court sitting without a jury. Accordingly, *1451 the issues of declaratory relief and liability were bifurcated from the issue of damages and the trial of this matter was directed solely to the issue of liability. Kuhlmeier v. Hazelwood School District, No. 83-2033C(1), unpublished Order and Memorandum (E.D.Mo., November 8, 1984).
This case was tried to this Court sitting without a jury. This Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, as required by Rule 52 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 52.

A. FINDINGS OF FACT
1. Plaintiffs Kathy Kuhlmeier, Lee Ann Tippett-West and Leslie Smart are residents of the State of Missouri and at all times relevant herein citizens of the United States. During the spring semester of 1983, said plaintiffs were students in the Journalism II class at Hazelwood East High School in St. Louis County, Missouri, and were members of the Spectrum staff. Ms. Kuhlmeier served as Spectrum's layout editor and performed the page layouts for the stories at issue herein. Ms. Smart served as newswriter and movie reviewer for Spectrum. Ms. Tippett served as news feature writer, cartoonist and part-time photographer for Spectrum. In addition, Ms. Tippett prepared a graph to be used in connection with one of the articles at issue herein. Said plaintiffs did not write any of the stories at issue herein.
2. Defendant Hazelwood School District (hereinafter "District") is a Missouri public school district organized pursuant to, and operated in accordance with, statutes of the State of Missouri. Responsibility for the government and operation of the District is vested in a six (6)-director Board of Education (hereinafter "Board"). During the period relevant to this case, the Board was comprised of defendants Charles E. Sweeney (President), Joseph E. Donahue (Vice-President), August A. Busch, Jr. (Treasurer), Gwendolyn L. Gerhardt (Secretary), James E. Arnac, and Ann Gibbons. The Board controls all aspects of the District's operations, exercises general supervision over the schools of the District, and adopts and revises the rules, regulations and policies of the District. Hazelwood East High School (hereinafter "Hazelwood East") is one of three secondary schools operated by the District. Hazelwood East has an enrollment of approximately 1,800 students in grades nine (9) through twelve (12).
During all periods relevant to this lawsuit, defendant Thomas J. Lawson has been the Superintendent of the Hazelwood School District, defendant Frances Huss has been the Assistant superintendent for secondary education of the Hazelwood School District, defendant Robert Eugene Reynolds has been the principal and instructional leader of Hazelwood East High School, and defendant Howard Emerson has been the coordinator of school information and year book sponsor at Hazelwood Central High School. Dr. Lawson is the chief executive officer of the District and is responsible for carrying out and enforcing the policies of the school board. Dr. Huss' responsibilities include supervision over all high school personnel, curriculum, activities, instruction, programs, budgets, and expenditures. He is the immediate supervisor of the District's high school principals, including the principal of Hazelwood East. In addition to being the educational leader and chief administrator of Hazelwood East, Mr. Reynolds is responsible for Hazelwood East's budget. In addition to his responsibilities at Hazelwood Central High School, Mr. Emerson served as temporary year book sponsor, journalism teacher and faculty advisor for Spectrum at Hazelwood East from May 1, 1983, through the end of the 1982-83 academic year.
All of the individual defendants in this case are citizens of the United States and reside within the Eastern District of Missouri. Both the District and Hazelwood East are located and operated exclusively within the Eastern District of Missouri.
*1452 3. During the 1982-83 academic year, the Hazelwood East curriculum included two (2) journalism classes, "Journalism I" and "Journalism II". In Journalism I, students were taught the principles of reporting, writing, editing, layout, publishing, and journalistic ethics. Students could not enroll in Journalism II unless they first completed Journalism I. The textbook used for these courses, English and Hach, Scholastic Journalism (6th ed. 1978), was approved by the Board. Said textbook included chapters on "Understanding Press Law" and "Handling Sensitive Issues". Both Journalism I and Journalism II were taught at Hazelwood East by Robert Stergos from 1981 through April 29, 1983. The authors of the articles at issue herein, as well as plaintiffs, were enrolled in and completed Journalism I during the fall of 1982.
Journalism II was taught during the spring of 1983. Most Journalism II students, including plaintiffs and all of the authors of the articles in question, were juniors or seniors. In Journalism II, students continued to receive instruction on topics relevant to newspaper journalism. However, the primary activity of students enrolled in Journalism II was production and publication of Hazelwood East's school newspaper, Spectrum. This activity is best described as a classroom exercise or "lab" in which Journalism II students were given an opportunity to apply the knowledge and skills derived from the instruction they received. For example, the course description for Journalism II in the Curriculum Guide was, as follows: "Journalism II provides a laboratory situation in which the students publish the school newspaper applying the skills they have learned in Journalism I". In addition, the main concepts or ideas underlying Journalism II were, as follows:
1. An experience for students to practice journalistic techniques learned in Journalism I by publishing the school newspaper under the pressures of pre-established deadlines.
2. the legal, moral, and ethical restrictions imposed upon journalists within the community.
3. responsibility and acceptance of criticism for articles of opinion.
4. leadership responsibilities as issue and page editors.
5. creative and imaginative layouts which present the news within an accurate, fair, and balanced format.
6. pride in the school newspaper.
7. journalism as a potential career choice.
Both Journalism I and Journalism II were taught according to the Curriculum Guide which was approved by the Board.
Students received a grade and course credit for participation in Journalism II. Not all stories produced in the Journalism II class were printed in Spectrum. Grades were not affected by whether an article was published.
4. Spectrum was the school-sponsored newspaper at Hazelwood East. Spectrum was published approximately six (6) times per semester and typically included stories of interest to students, such as sports, interviews with faculty members, prom news, news items, movie reviews, editorials, and current items of interest. The paper typically covered four (4) sides of 11 inch by 17 inch paper. However, a six (6)-page paper was often printed in connection with special events, such as Homecoming, Prom, or the "Senior" issue. When Spectrum was published, it was sold during lunch for 25 cents per copy in the "commons" area of Hazelwood East. In addition, the paper could be purchased from the journalism room which was located in the library of Hazelwood East. The Board allocated operating funds to Spectrum in its annual budget and this amount was supplemented by the revenues received from sales of the newspaper. During the 1982-83 school year, printing expenses amounted to $4,668.50, $1,166.84 of which was defrayed through sales. Spectrum was printed by Messenger Printing Company, a private business.
For the most part, Spectrum was written and designed by students in the Journalism *1453 II class. Spectrum's staff was essentially restricted to students in the Journalism II class. However, Hazelwood East students not enrolled in Journalism II could submit material for publication in Spectrum so long as the material met the standards set forth in Hazelwood School Board Policy No. 348.51. For example, Spectrum often published a column entitled "Letters to the Editor". There was one exception in the spring of 1983, because Elizabeth Conley, author of one of the stories at issue herein, was not enrolled in Journalism II and worked on the staff of Spectrum as part of an independent study program. The reason for this arrangement was that Ms. Conley was enrolled in a Calculus class during the period that the Journalism II class met. However, she did meet with Mr. Stergos, the teacher of the Journalism II class, during her independent study hour. With the exception of Ms. Conley, Spectrum staff members enrolled in Journalism II met each day during the spring of 1983 for approximately fifty (50) minutes in the journalism room with Mr. Stergos as their instructor. During this period, staff members worked on producing Spectrum. Spectrum staff members were permitted to obtain passes to leave the journalism room to do research and investigation on stories during the Journalism II period. In addition, some work was done by Spectrum staff members outside the Journalism II period, both during the school day and at home. However, the amount of work required outside of the regular class meeting period was not substantially greater than that required in other courses taught at Hazelwood East. In this regard, Spectrum was an integral part of the Journalism II course and was not akin to an extra-curricular activity, such as Hazelwood East's Student Council, team sports, or cheerleading squad.
The content of Spectrum included matters of interest to the entire Hazelwood School District community. Among the topics covered by articles appearing in Spectrum since 1976, were the following: 1) teenage dating; 2) the effects of television on children; 3) students' use of drugs and alcohol; 4) race relations; 5) teenage marriage; 6) the death penalty; 7) the St. Louis Schools desegregation case; 8) runaways; 9) teenage pregnancy; 10) religious cults; 11) the draft; 12) school busing; and 13) students' fourth amendment rights.
The Journalism II course was taught by, and Spectrum was produced under the direction of, a teacher at Hazelwood East. Robert Stergos was this teacher during the spring semester of 1983, until April 29, 1983. Mr. Stergos, as the teacher of Journalism II, both had the authority to exercise and in fact exercised a great deal of control over Spectrum. Mr. Stergos selected the editor, assistant editor, layout editor and layout staff of the newspaper. He scheduled publication dates, decided the number of pages for each issue, assigned story ideas to class members, counseled students on the development of the stories, reviewed the use of quotations, edited stories, adjusted layouts, selected the letters to the editor, edited the letter to the editor, called in corrections to the printer, and sold papers from the Journalism II classroom. Although several of these decisions were made in consultation with some of the students in the Journalism II class, many of these decisions were made without such consultation. It is clear that Mr. Stergos was the final authority with respect to almost every aspect of the production and publication of Spectrum, including its content. Plaintiffs were well aware of Stergos' control over Spectrum.
A certain amount of control, or pre-publication review, was exercised by Mr. Stergos' superiors prior to the incident in question. Dr. Huss testified that the District had previously prevented the publication of articles in the District's school newspapers based on their content. Dr. Lawson testified that prior review of controversial or sensitive materials by a high principal was standard procedure. In early January, 1983, a meeting was held at which Dr. Huss, Mr. Reynolds, Mr. Stergos, and Ms. Jane Huff, Chairman of the English Department, were in attendance. At that *1454 meeting, Mr. Stergos was informed that Board policy should not be questioned in Spectrum and that Mr. Stergos was to submit a copy of each issue of Spectrum to Mr. Reynolds prior to its being sent to the printer. Mr. Stergos complied with this request throughout the spring of 1983 and, in fact, Mr. Stergos passed this directive on to his successor, Mr. Emerson. In addition, in the early part of the spring semester of 1983, Dr. Huss advised each of the high school principals to limit the length of their respective school newspapers to four (4) pages in each issue due to budget overruns. Mr. Reynold communicated this directive to Ms. Huff. There was no direct evidence that Ms. Huff communicated this page limit rule to Mr. Stergos, but the control which Ms. Huff and Mr. Reynolds had over Spectrum is evidenced by the fact that they discussed deleting entirely the last two issues of Spectrum in the spring of 1983 due to budget overruns.
5. Mr. Stergos received extra-duty pay in the amount of $325.00 for his services in connection with Spectrum. Mr. Stergos also received $325.00 in extra-duty pay for his services as coach of the Hazelwood East baseball team. However, Dr. Huss testified that the amounts received by Mr. Stergos for his Journalism II services were only to reimburse him for the time he spent going to and from the printer and for the use of his own automobile therefor. The amount paid to Mr. Stergos was arrived at by multiplying the number of hours spent by him traveling to and from the printer times the applicable rate. This Court credits Dr. Huss' testimony.
6. Each issue of Spectrum was produced according to the following procedure. Ideas for stories were collected from Spectrum staff members on a weekly basis. Another source of story ideas were the letters to the editor. The student editors, in consultation with Mr. Stergos, would then select from among those story ideas that they wanted to develop into articles for publication. Mr. Stergos would then assign individual staff members to work on the ideas selected and determine how long each story should be. Although staff members often traded topics, Mr. Stergos was the final authority.
The person assigned to a story idea would then begin researching and writing the story. Initially, the precise content of the story was left to the individual writer. However, once a draft was completed it was submitted to Mr. Stergos who would review the article, make comments, and return it to the student to be rewritten or researched further. Articles commonly went through this review and revision process three (3) or four (4) times.
A writer who used personal quotes in a story was required to obtain consent from each person quoted. The procedure for obtaining consent was to have the subject initial his quote on the draft.
Once a final draft was completed, the story would be submitted in copy sheet form to the copy editor to be proofed, then to the layout editor to be arranged on the page. At this stage of the process, Mr. Stergos often edited the articles himself. After the proposed layouts were approved by Mr. Stergos, the copy sheets of the stories, together with the layout diagrams, were sent to Messenger Printing Company in Kirkwood, Missouri, where galley proofs were prepared. After the galley proofs were returned from the printer, the authors would each proofread their own stories and their work would be double checked by Spectrum staff members. Mr. Stergos also proofread all articles. Corrections would be telephoned to the printer. The paper would then be printed in its final form and returned to Hazelwood East for sale.
7. On September 14, 1982, an item was published in Spectrum entitled "Statement of Policy". This article stated, in pertinent part, as follows:

Spectrum is a school funded newspaper; written, edited, and designed by members of the Journalism II class with assistance of advisor Mr. Robert Stergos.

*1455 Spectrum follows journalism guidelines that are set by Scholastic Journalism textbook,....

Spectrum, as a student-press publication, accepts all rights implied by the First Amendment of the United States Constitution which states that: "Congress shall make no law restricting ... or abridging the freedom of speech or the press ..."
That this right extends to high school students was clarified in the Tinker v. Des Moines Community School District case in 1969 [393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731]. The Supreme Court of the United States ruled that neither "students nor teachers shed their constitutional rights to freedom of speech or expression at the school house gate." Only speech that "materially and substantially interferes with the requirements of appropriate discipline" can be found unacceptable and therefore prohibited.
According to Mr. Stergos, this policy statement was published in Spectrum at the beginning of each academic year. However, no documentary evidence was introduced to prove that this statement of policy was published at any other time. The following description did appear in every issue of Spectrum during the 1982-83 academic year:

Spectrum is published approximately every three weeks by students in the Journalism II class and printed by Messenger Printing Company in Kirkwood, Missouri.
In the January 14, 1980, issue of Spectrum, a non-by-lined editorial was printed entitled "The Right To Write". This editorial described Spectrum, as follows:
Because Spectrum is a member of the press and especially because Spectrum is the sole press of the student body, Spectrum has a responsibility to that student body to be fair and unbiased in reporting, to point out injustice and, thereby, guard student freedoms, and to uphold a high level of journalistic excellence. This may, at times, cause Spectrum to be unpopular with some. Spectrum is not printed to be popular. Spectrum is printed to inform, entertain, guide and serve the student body  no more and, hopefully, no less.
However, the statement of policy published on September 14, 1982, stated that "[a]ll non-by-lined editorials appearing in this newspaper reflect the opinions of the Spectrum staff, which are not necessarily shared by the administrators or faculty of Hazelwood East."
8. The Board created and published two (2) policies governing student expression within the District. The first, Board Policy 348.5, was entitled "Student Publications" and provided, as follows:
a. Students are entitled to express in writing their personal opinions. The distribution of such material on school property may not interfere with or disrupt the educational process. Such written expressions must be signed by the authors.
b. Students who edit, publish or distribute handwritten, printed or duplicated matter among their fellow students within the schools must assume responsibility for the content of such publications.
c. Libel, obscenity, and personal attacks are prohibited in all publications.
d. Unauthorized commercial solicitation will not be allowed on school property at any time. An exception to this rule will be the sale of non-school sponsored student newspapers published by students of the district at times and in places as designated by school authorities.
The second Board policy, Board Policy 348.51, is entitled "School Sponsored Publications" and provided, as follows:
School sponsored student publications will not restrict free expression or diverse viewpoints within the rules of responsible journalism. School sponsored publications are developed within the adopted curriculum and its educational implications and regular classroom activities.

*1456 Students who are not in the publications classes may submit material for consideration according to the following conditions:
a. All material must be signed.
b. The material will be evaluated by an editorial review board of students from the publications classes.
c. A faculty-student review board composed of the principal, publications teacher, two other classroom teachers and two publications students will evaluate the recommendations of the student editorial board. Their decision will be final.
No material shall be considered suitable for publication in student publications that is commercial, obscene, libelous, defaming to character, advocating racial or religious prejudice, or contributing to the interruption of the educational process.
9. Plaintiffs' testimony that they believed that they could publish "practically anything" in Spectrum was not credible. Plaintiffs were well aware of the control that Mr. Stergos exercised over Spectrum.
10. A poster hung on the wall of the journalism room at Hazelwood East which poster listed five (5) criteria for publication of sensitive issues. These criteria were taken from the Scholastic Journalism textbook and were identified by Mr. Stergos, as follows: 1) Is the issue relevant to readers?; 2) Will publication of the topic be helpful to readers or merely interesting or shocking?; 3) Will publication of the issue relate to aspects of the school program?; 4) Will the fact that eighteen year olds may vote help justify publication of some issues?; and 5) Will publication of the issue be for the common good, have news value, or merely be a private situation?
11. Board Policy No. 341.5, entitled "Controversial Issues", provided, in pertinent part, as follows:
It is the responsibility of the teacher to see that the controversial issues discussed in the classroom are relevant to the course of study, limited to the level of understanding and age group of the student, and maintained within the bounds of objectivity commonly acceptable to the community.
The student shall have rights during these discussions.
Specifically, the student shall have:
a. The right to study any controversial issue which has political, economic, or social significance, and concerning which (at his/her level) he/she should begin to have an opinion.
b. The right to have access to all relevant information, including the materials which circulate freely in the community.
c. The right to study under competent instruction in an atmosphere free from prejudice and bias.
d. The right to form and express one's own opinions on the controversial issues without, thereby, jeopardizing the relationship with the teacher or with the school.
12. Part 7 of the Scholastic Journalism textbook was entitled "Examining the Mass Media". Chapter 24 of said textbook, which chapter appears in Part 7, was entitled "Cannons of Journalism". The ethical rules adopted by the American Society of Newspaper Editors were reprinted in Chapter 24 at pages 272-75. Rule I-C-7, entitled "Fair Play", provided, as follows:
a. Journalists should respect the rights of people involved in the news, observe the common standards of decency and stand accountable to the public for the fairness and accuracy of their news reports.
b. Persons publicly accused should be given the earliest opportunity to respond.
In addition, the Chicago Sun-Times code of professional standards was reprinted at pages 265-66. It also contained a section entitled "Fair Play" and provided, in pertinent part, as follows:
We should at all times show respect for the rights of those encountered in the course of gathering and presenting news. In this respect:

*1457 1. Any person or organization whose reputation is attacked is entitled to simultaneous rebuttal.
2. Every effort should be made to present all sides of controversial issues.
3. The anonymous quote, especially in stories involving controversial issues, is to be avoided except in those cases when the reasons for concealing the identity of the source are manifestly clear to the reader.
13. The articles in question were researched and written by several Spectrum staff members for publication in the May 13, 1983, issue of Spectrum. The articles were laid out to appear as pages 4 and 5 of said issue. A group of three articles covered the top half of pages 4 and 5 and the headline accompanying said articles appeared on both pages 4 and 5. The headline was, as follows:

Pressure Describes It All For Today's Teenagers

Pregnancy Affects Many Teens Each Year
The first article in the group of three was written by Andrea Callo and basically surveyed statistics concerning teenage pregnancy and briefly covered various topics including teenage sexuality, birth control, relations with parents, abortion, and the consequences of teenage pregnancy. The article included a table of statistics on teenage abortions covering the years 1976 through 1980. The article relied heavily on material from a Reader's Digest article. The second article in the group of three was entitled "Squeal Law" and was written by Christine De Hass. The article discussed a proposed rule that would require federally funded clinics to notify parents when teenagers sought birth control assistance. The article contained several quotes and relied heavily on an article appearing in The New Republic. The third article consisted of separate "personal accounts of three Hazelwood East students who became pregnant." The introduction to the article stated that "all names have been changed to keep the identity of these girls a secret." In each of the three accounts, the student discussed her reaction to becoming pregnant, her plans for the future, her relationship with the father, the reaction of her parents, and details about her sex life and use or non-use of birth control methods. The "fictitious" names of the three girls were "Terri", "Patti", and "Julie". A silhouette of a pregnant teenager was superimposed on the article.
Three (3) other articles were spread across the bottom half of pages 4 and 5. Beth Conley wrote an article entitled "Teenage Marriages Face 75% Divorce Rate". The article relied heavily on several sources, including a faculty member at Hazelwood East, and essentially surveyed the problems faced by teenage marriages. Mary Williams wrote an article entitled "Runaways And Juvenile Delinquents Are Common Occurrences In Large Cities", which article was actually laid out as two separate articles subtitled "Runaways" and "Juvenile Delinquents". The first half of the article, which relied heavily on sources, surveyed possible reasons for teenagers running away and identified sources of help that are available to runaways. The second half of the article, which also relied heavily on sources, surveyed the categories of juvenile delinquency and the procedures available to deal with juveniles. Finally, Shari Gordon wrote an article entitled "Divorce's Impact On Kids May Have Life Long Affect". The article dealt with the frequency and causes of divorce, as well as the affect of divorce on children. The article contained a quote from a student who was identified only as a "Junior", as follows:
"My dad didn't make any money, so my mother divorced him."
"My father was an alcoholic and he always came home drunk and my mom really couldn't stand it any longer,"....
A Freshman identified by name as "Diana Herbert" gave the following quote:
"My dad wasn't spending enough time with my mom, my sister and I. He was always out of town on business or out late playing cards with the guys. My *1458 parents always argued about everything."
"In the beginning I thought I caused the problem, but now I realized it wasn't me," added Diana.
Similar quotes were provided from students identified by name as Susan Kiefer and Jill Viola.
The article by Christine De Hass on three (3) accounts of pregnant students was prepared by submitting written questions, which she formulated, to the three (3) subjects. The three (3) students questioned were each advised by Ms. De Hass of the reason for which the information was being sought and told that it was to be used in the newspaper. The students were told that their names would not be used. The students agreed to participate, completed the questionnaires, and then returned them to Ms. De Hass. Ms. De Hass, in turn, edited them for publication and substituted pseudonyms for all names used. However, the three (3) students were not given any instructions with respect to obtaining parental consent. In addition, no evidence was presented with respect to the age of the three (3) students who were questioned.
Shari Gordon prepared her story, in part, by submitting written questionnaires to various students. The questions she submitted were written by her and then approved by Mr. Stergos. The questionnaires had to be signed and asked, inter alia, if the subjects wanted their names printed in the paper. Consent was obtained from all subjects quoted in the story, even where their names were not used, but the consent of the students' parents was not solicited nor were any parents contacted to explain or rebut the quoted statements of their children.
14. Mr. Stergos left his employment with the District on April 29, 1983. At the time he left, the May 13, 1983, issue of Spectrum was essentially ready to be sent to the printers. Effective May 1, 1983, at the direction of Drs. Huss and Lawson, Mr. Emerson took over as faculty advisor for Spectrum. Before Mr. Stergos left, he told Mr. Emerson that issues of Spectrum must be submitted to Mr. Reynolds prior to publication. Mr. Emerson took Mr. Stergos' place in the Hazelwood East yearbook class, but a Mrs. Ludwinski was the substitute teacher for the Journalism II class. Mrs. Ludwinski did not have a journalism background and, therefore, Mr. Emerson assisted the Journalism II class in publishing the last two issues of Spectrum during the spring of 1983.
The deadline for the May 13, 1983, issue of Spectrum to be in copy sheet form was May 4, 1983. On or about May 5 or 6, 1983, Mr. Emerson took the copy sheets of all of the articles scheduled for publication in the May 13, 1983 issue of Spectrum, including the articles in question and the layout diagrams for the issue, to Messenger Printing Company. At the same time, Spectrum staff members prepared a banner announcing publication of the stories in the forthcoming May 13, 1983 issue of Spectrum. Similar banners were prepared for every issue of Spectrum. This particular banner advertised, inter alia, articles on "Teenage Pregnancy", "Juvenile Delinquency", and "Divorce". The banner was approximately nine (9) feet long by two (2) feet wide and was hung from an area over the Hazelwood East cafeteria, an area through which Mr. Reynolds had to pass to get to his office.
The May 13, 1983, issue of Spectrum was delivered to Mr. Emerson at Hazelwood East in galley proof form on Tuesday, May 10, 1983, by Messenger Printing Company. The newspaper was then proofread by the Spectrum staff and by Mr. Emerson. Several corrections were made as a result of the proofreading. Mr. Emerson personally made a change in Shari Gordon's story by deleting Diana Herbert's name in connection with her statements that were quoted in the paper.
On the same date, Mr. Emerson left a set of uncorrected galley proofs of the May 13, 1983 issue with Mr. Reynolds' secretary. When Mr. Emerson did not hear from Mr. Reynolds, Mr. Emerson telephoned Mr. Reynolds at approximately 3:15 p.m. on *1459 May 11, 1983, regarding the Spectrum galley proofs. Mr. Reynolds read through the issue while he kept Mr. Emerson on the line, a process that took approximately twenty (20) minutes. Mr. Reynolds testified that, at the time, he thought Mr. Emerson was at Messenger Printing Company and that he had to make an immediate decision. Mr. Reynolds did not believe that there was time to make any changes in the content of the stories and that no paper would be produced if the issue were delayed for any amount of time. This Court credits Mr. Reynolds' testimony and his beliefs were reasonable under the circumstances. No evidence was presented that his beliefs were unreasonable. Mr. Reynolds asked Mr. Emerson what would have to be done to delete the stories in question and Mr. Emerson responded that pages 4 and 5 could be deleted and page 6 could be changed to page 4. Mr. Reynolds directed Mr. Emerson to effectuate this. Mr. Reynolds then telephoned Dr. Huss, his immediate supervisor, to apprise Dr. Huss of his decision and Dr. Huss concurred.
The stories prepared for pages 4 and 5 of the May 13, 1983 issue of Spectrum were deleted without notice to any members of Spectrum's staff. Spectrum staff members learned that the stories in question had been removed when the final copies of the May 13, 1983 issue were delivered to the school for sale on the morning of May 13, 1983. Shortly after the deletions were discovered, a group of seven (7) Spectrum staff members met with Mr. Reynolds in his office to protest the deletions. Mr. Reynolds advised the group that the articles were deleted because they were "too sensitive" for "our immature audience of readers". Mr. Reynolds did not mention budget or page limitations as a reason for his decision. Following this meeting, the Spectrum staff took a vote and decided to sell the May 13, 1983 issue, despite the deletions.
The following Monday, May 16, 1983, the following notice was posted in the journalism room at Hazelwood East:
The content of some of the articles were personal and highly sensitive ------- people and names were used.
The information was sensitive and totally unnecessary to be included in the school newspaper.
They have many other opportunities to achieve goals in journalism class or publishing of the school newspaper that do not require that kind of reporting.
Learning can take place in research and reporting that is less sensitive, less controversial, and certainly something that is just as beneficial to the students.
Defendants deny that they caused this notice to be posted, but admit that it corresponds to public statements made by Mr. Reynolds and Dr. Lawson.
On the same date, Mr. Reynolds met with Spectrum staff members, together with Mr. Emerson and Ms. Jane Huff, to discuss deletion of the stories in question from the May 13, 1983 issue. At said meeting, Mr. Reynolds stated that the stories were deleted because they were inappropriate, personal, sensitive and unsuitable for the newspaper.
Also on May 16, 1983, Dr. Lawson sent a memorandum to the Board with copies of the deleted stories attached thereto. In the memorandum, Dr. Lawson stated his approval for the deletions and the reasons therefor, as follows:
It was necessary for Mr. Reynolds to remove this because he wasn't aware that the stories were even being prepared -------- or the sensitive, controversial nature of the story.
Following the deletions of the stories in question, Mr. Reynolds and Dr. Lawson made numerous statements to the press regarding their reasons for the censorship. In one article, Mr. Reynolds was quoted, as follows:
"Our position on these articles is that the content was personal and highly sensitive."
"It was inappropriate to be used in a school newspaper." *1460 In another article, Dr. Lawson was quoted, as follows:
"It was information that was very sensitive and totally unnecessary to be included in the school newspaper."
15. Mr. Reynolds testified that he had no objection whatsoever to the article by Beth Conley on teenage marriages, the article by Mary Williams on runaways and juvenile delinquents, the article by Andrea Callo on teenage pregnancy, or the article by Christine De Hass on the squeal law. However, Mr. Reynolds objected to both the three (3) personal accounts of pregnant Hazelwood East students and Shari Gordon's story on the impact of divorce on children. With respect to the personal accounts of three (3) Hazelwood East students who were pregnant, Mr. Reynolds was concerned that the girls had been described to the point where they could be identified by their peers. In addition, he objected to their discussion of their sexual activity. With respect to Shari Gordon's story, Mr. Reynolds objected to the use of Diana Herbert's name and the inclusion of the following quotes from her:
"My father was an alcoholic and he always came home drunk and my mom really couldn't stand it any longer,"....
"My dad wasn't spending enough time with my mom, my sister and I. He was always out of town on business or out late playing cards with the guys. My parents always argued about everything."
"In the beginning I thought I caused the problem, but now I realize it wasn't me,"....
In addition, Mr. Reynolds objected to the above portion of Shari Gordon's story, because he thought that fairness required that her parents be notified and given an opportunity to respond. This Court credits Mr. Reynolds' testimony.
Although Mr. Reynolds was aware of certain budgetary constraints and the directive that Spectrum be limited to four (4) pages per issue, but for his objections to the personal accounts of three (3) Hazelwood East students who were pregnant and certain portions of Shari Gordon's story, Mr. Reynolds would not have deleted the articles in question from the May 13, 1983 issue of Spectrum.
16. In the spring of 1983, there were approximately eight (8) to ten (10) students at Hazelwood East who were pregnant. Mr. Reynolds' concern that the students discussed in the three (3) personal accounts could be identified was legitimate. The subject identified as "Terri" might be identified because it could be derived from the article that her due date was sometime in July, 1983, and that she had dropped out of school. Ms. Jane Huff testified that on or about the time the articles in question were deleted, she thought she could identify two (2) of the subjects discussed in the three (3) personal accounts. She further testified that at the time of trial she could positively identify one (1) and possibly all three (3). This Court credits Ms. Huff's testimony.
17. Expert testimony was received from two (2) individuals in this case. Plaintiffs' expert witness was Dr. Robert P. Knight, Professor of Journalism at the University of Missouri-Columbia. Dr. Knight has had extensive experience with high school newspapers and high school journalism contests. He based his opinion in this case on information that he received from Mr. Stergos, documents supplied to him and the articles in question. It was Dr. Knight's opinion that the articles in question complied with recognized journalism standards, that nothing in their content was libelous or obscene and that they would not cause a material or substantial disruption of the educational environment at Hazelwood East. However, on cross examination Dr. Knight admitted that his actions with respect to this case have been less than objective and independent. Prior to a national convention of investigative reporters and editors in St. Louis, Missouri, during June, 1983, Dr. Knight distributed originals of the stories in question to persons attending the convention. The stories were accompanied with a one (1) page summary of the facts and a statement of Dr. Knight's own opinions. Dr. Knight encouraged those in *1461 attendance to discuss the issues raised by the deletions of the stories in question and to come to the aid of plaintiffs. Dr. Knight presented his case to the executive committee of the convention and said committee determined that so-called "student press rights" were outside the province of its organization. In addition, Dr. Knight was actively involved in keeping a certain journalism publication apprised of the progress of this case. Dr. Knight also described what is meant by the term "fairness" in the journalism field. To be fair is to give a complete picture in a story and an opportunity for all sides to an issue to respond.
Defendants' expert witness was Mr. Martin Duggan, a recent appointee to the Federal Commission on Compensation and former editorial page editor for the St. Louis Globe Democrat. Mr. Duggan has been a journalism instructor at Fontbonne College and supervised the production of a newspaper that was part of the journalism courses taught by Mr. Duggan. Mr. Duggan's experience with high school journalism was limited to being a guest lecturer and giving seminars and work shops, but he once acted as an adviser for a newspaper published by Junior Achievement, a youth organization. Mr. Duggan's first contact with the articles in question was at his deposition in April, 1984. He testified that "fairness and balance" is a term of art in the journalism field and requires journalists to provide all sides to a particular issue. Mr. Duggan testified that Shari Gordon's divorce story did not meet this standard because Diana Herbert's father was not given an opportunity to respond. In addition, he thought that both Shari Gordon's story and the three (3) personal pregnancy accounts were not appropriate for publication because they involved invasions of privacy. Mr. Duggan further testified that there is a difference between editing and censorship. Censorship comes from an outside source, whereas editing is the prerogative of an authority within the publishing entity.
Mr. Duggan's opinion is entitled to more weight than Dr. Knight's opinion. Dr. Knight is deeply and personally involved with high school press issues and his own personal interests are basically aligned with an expansion of student press rights. Mr. Duggan, on the other hand, was an objective and independent witness who was not even compensated by defendants for his testimony.
18. Spectrum was an integral part of the Journalism II class and was not a public forum.
19. Mr. Emerson, Mr. Reynolds, Dr. Huss, and Dr. Lawson are professional educators with many years of experience in dealing with high school age students. Their judgment that portions of the articles in question were not appropriate for high school age readers or publication in a school sponsored newspaper is both reasonable and entitled to great deference.
20. Plaintiffs and the other members of Journalism II class in the spring of 1983 received academic credit and a grade for their work in said class. No grade was affected by reason of the incident involved herein.
21. Several copies of the articles in question were circulated in xerox form at Hazelwood East subsequent to May 13, 1983. No efforts were made by defendants to stop said circulation or to punish the individuals responsible therefor.

B. CONCLUSIONS OF LAW
This case concerns the scope of high school students' first amendment rights in the context of an official school-sponsored newspaper. This Court possesses subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(3) and 1343(4), and plaintiffs' claims for relief are authorized by 28 U.S.C. §§ 2201, 2202; 42 U.S.C. §§ 1983, 1988.
Plaintiffs seek a declaration by this Court that: a) Spectrum was a free speech forum fully protected by the first amendment; b) defendants' prior restraint of the May 13, 1983 issue of Spectrum denied plaintiffs' rights secured by the first and fourteenth amendments; and c) defendants' policies, practices, customs, rules and *1462 regulations governing publication of Spectrum failed to comport with constitutionally-mandated standards. As discussed infra, this Court concludes that Spectrum was not a public forum and that defendants' conduct in this case did not deny plaintiffs their constitutional rights. This Court does not find it necessary to address the facial constitutionality of defendants' policies, practices, or rules.
The starting point for this Court's analysis is the almost talismanic phrase uttered by the Supreme Court in Tinker v. Des Moines School District, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969): high school students do not "shed their constitutional rights to freedom of speech or expression at the school house gate." In Tinker, the Supreme Court held that the first amendment rights of three high school students were violated when they were suspended for wearing black armbands as a Vietnam War protest. The court held that such symbolic speech could not be punished where it would not result in "substantial disruption or material interference with school activities". Id. at 514, 89 S.Ct. at 740. In so holding, the Supreme Court made it clear that the first amendment rights of students in a high school setting are not coextensive with those of adults. See Williams v. Spencer, 622 F.2d 1200, 1205 (4th Cir.1980). Student speech or conduct may be regulated or prohibited in the school setting, if it "materially disrupts class work or involves substantial disorder or invasion of the rights of others." Id. at 513, 89 S.Ct. at 740. The unique circumstances of the school environment justify such limits on students' first amendment rights. Id. at 506, 89 S.Ct. at 736. "In the high school setting, school officials and teachers must be accorded wide latitude over decisions affecting the manner in which they educate students." Nicholson v. Board of Education, 682 F.2d 858, 863 (9th Cir.1982). Tinker and its progeny establish that in balancing students' free speech rights against the discretion needed by educators, "school officials must bear the burden of demonstrating `a reasonable basis for interference with student speech, and ... courts will not rest content with officials' bare allegation that such a basis existed.'" Trachtman v. Anker, 563 F.2d 512, 517 (2d Cir.1977), cert. denied, 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978), quoting Eisner v. Stamford Board of Education, 440 F.2d 803, 810 (2d Cir.1971). Public schools constitute an arm of the state and it is the role of the Courts under our Constitution to resolve the disputes inherent in such a balancing process. Fraser v. Bethel School District, 755 F.2d 1356 at 1358 (9th Cir. 1985).
Two lines of cases have developed for dealing with student free speech and press issues. One line of cases consists of those situations where student speech or conduct occurred outside of official school programs. In the other are cases where the speech or conduct in question occurred within the context of school-sponsored programs. The conduct of the students in Tinker was symbolic speech that was privately initiated and carried out independent of any school-sponsored program or activity. Students' first amendment rights generally prevail where the speech or conduct that is sought to be prohibited or regulated is private, non-school-sponsored and non-program related. See, e.g., Nitzberg v. Parks, 525 F.2d 378 (4th Cir.1975) (regulations that prevented distribution of private student newspaper held invalid); Baughman v. Freienmuth, 478 F.2d 1345 (4th Cir.1973) (regulations that restrained distribution of non-school-sponsored literature held invalid); Fujishima v. Board of Education, 460 F.2d 1355 (7th Cir.1972) (rule prohibiting distribution of underground newspaper held invalid); Shanley v. Northeast Independent School District, Bexar County, Texas, 462 F.2d 960 (5th Cir.1972) (prior restraint on distribution of underground newspaper held invalid); Quarterman v. Byrd, 453 F.2d 54 (4th Cir.1971) (prior restraint on distribution of underground newspaper held invalid); Eisner v. Stamford Board of Education, 440 F.2d 803 (2d Cir.1971) (prior restraint on distribution of underground newspaper invalidated); *1463 Leibner v. Sharbaugh, 429 F.Supp. 744 (E.D.Va.1977) (regulations that prevented distribution of underground newspaper invalidated); Poxon v. Board of Education, 341 F.Supp. 256 (E.D.Ca.1971) (prior restraint on distribution of nonschool-sponsored newspaper held unconstitutional). On the other hand, the results have been mixed in cases where educators have attempted to regulate, prohibit or punish student speech or conduct in the context of school-sponsored publications, activities or curricular matters. See e.g., Fraser v. Bethel School District, 755 F.2d 1356 (9th Cir.1985) (student could not be disciplined for sexual content of student government nomination speech given during school assembly); Nicholson v. Board of Education, 682 F.2d 858 (9th Cir.1982) (pre-publication review of journalism class-produced school newspaper upheld); Seyfried v. Walton, 668 F.2d 214 (3rd Cir.1981) (school legally prevented performance of school-sponsored theatrical production); Trachtman v. Anker, 563 F.2d 512 (2d Cir.1977), cert. denied, 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978) (distribution of sex questionnaire in school newspaper properly prevented due to possible harm to students); Gambino v. Fairfax County School Board, 564 F.2d 157 (4th Cir.1977) (educators enjoined from prohibiting publication of article in school newspaper); Stanton v. Brunswick School Department, 577 F.Supp. 1560 (D.Ma.1984) (school officials enjoined from preventing publication of student quote in year book); Reineke v. Cobb County School District, 484 F.Supp. 1252 (N.D.Ga.1980) (school district enjoined from censoring and controlling student newspaper published by journalism class); Frasca v. Andrews, 463 F.Supp. 1043 (E.D.N.Y.1979) (school officials properly prevented publication of letter in official school newspaper that would result in substantial disruption of school); Bayer v. Kinzler, 383 F.Supp. 1164 (E.D.N. Y.1974) aff'd without op., 515 F.2d 504 (2d Cir.1975) (school authorities violated students' rights in seizing and preventing distribution of sex information supplement in school newspaper); Zucker v. Panitz, 299 F.Supp. 102 (S.D.N.Y.1969) (school officials enjoined from prohibiting publication of Vietnam protest ad in school newspaper).
In the first line of cases, the free speech and press rights of students are at their apogee. The primary focus is on the extent to which the exercise of such rights would interfere with the educational process. In such cases, school officials are rarely able to show that non-program related student speech or conduct will materially disrupt the educational process. In the second line of cases, however, the interests of school officials and the special function performed by schools in our society are given considerably more weight. The initial focus is not so much on the effect of the students' speech or conduct as it is on the nature of the school-sponsored program or activity in question. Where the particular program or activity is an integral part of the school's educational function, something less than substantial disruption of the educational process may justify prior restraints on students' speech and press activities. The following is an acceptable articulation of the applicable standard:
[T]he rule has been wisely established that decisions of school officials will be sustained, even in a First Amendment context, when, on the facts before them at the time of the conduct which is challenged, there was a substantial and reasonable basis for the action taken.
Frasca, 463 F.Supp. at 1052 (citation omitted). The second line of cases is applicable to the case at bar, because Spectrum was the official school-sponsored newspaper of Hazelwood East and was produced by students in the Journalism II class. See Findings of Fact Nos. 3 and 4.
When faced with determining the scope of students' first amendment rights within the context of school-sponsored programs, courts focus on whether the particular program or activity is an open and public forum of free expression or an integral part of the curriculum. While a public high school is under no obligation to provide its students with a public forum for free expression, Bender v. Williamsport *1464 Area School District, 741 F.2d 538, 546-47 (3rd Cir.1984), where school officials do create an open forum for student expression, the first amendment greatly limits the extent to which school officials may restrain or silence student expression based on the message or content of said expression. Id. See also Widmar v. Vincent, 454 U.S. 263, 267-268, 102 S.Ct. 269, 273-274, 70 L.Ed.2d 440 (1981). In Fraser v. Bethel School District, 755 F.2d 1356 (9th Cir.1985), school officials were under no obligation to organize a student assembly for the purpose of allowing students to make speeches nominating candidates for student government office. However, having organized such an assembly and having "created an open forum for students to express their political views", school officials could not punish a student for making a speech that was neither obscene nor disruptive. Fraser, at 1365. The Fraser court viewed the assembly as far removed from the "compulsory environment of the class room", for the following reasons:
Although Fraser delivered his speech to a school-sponsored assembly, his speech was clearly not part of the school curriculum. The assembly, which was run by a student, was a voluntary activity in which students were invited to give their own speeches, not speeches proscribed by school authorities as part of the educational program. Attendance, moreover, was not compulsory; students were free to attend a study hall instead.
Fraser, at 1364.
The public forum/curriculum distinction was the "critical factor" in Seyfried v. Walton, 668 F.2d 214 (3d Cir.1981), which upheld a public high school superintendent's decision to cancel a high school dramatic production of the musical "Pipin", because of its sexual theme, against the assertion that the cancellation violated students' first amendment rights of expression. The court reasoned, as follows:
We believe that the district court properly distinguished student newspapers and other "non-program related expressions of student opinion" from school-sponsored theatrical productions.... The critical factor in this case is the relationship of the play to the school curriculum. As found by the district court, both the staff and the administration view the spring production ... as "an integral part of the school's educational program." Participation in the play, though voluntary, was considered part of the curriculum in the theatre arts.
Id. at 216 (citations omitted). The Seyfried Court also viewed the cancellation as justified by the school's "important interest in avoiding the impression that it endorsed a viewpoint at variance with its educational program." Id. The holding that the students' first amendment rights were not violated, was further buttressed by the following facts:
[N]o student was prohibited from expressing his views on any subject; no student was prohibited from reading the script, an unedited version of which remains in the school library; and no one was punished or reprimanded for any expression of ideas.
Id.
The public forum/curriculum distinction was also a significant factor in several cases involving school-sponsored newspapers. In Gambino v. Fairfax County School Board, 564 F.2d 157 (4th Cir.1977), the court held that school officials could not prohibit publication of an article in the school newspaper. The court reasoned that "because the newspaper was established as a public forum and not as an official publication, it [could not] be viewed as part of the curriculum...." Id. at 158. In Bayer v. Kinzler, 383 F.Supp. 1164 (E.D.N.Y.1974) aff'd without op., 515 F.2d 504 (2d Cir.1975), school officials were enjoined from preventing distribution of copies of the school newspaper which contained a sex information supplement. The court rejected the defendants' argument that the prior restraint was justified under their authority over secondary school curriculum, as follows:
In this court's view, publication of the newspaper and supplement is an extracurricular *1465 activity rather than part of the curriculum. This view is buttressed by the fact that no academic credit is given for serving as a member of the newspaper staff.
Id. at 1166. In Zucker v. Panitz, 299 F.Supp. 102 (S.D.N.Y.1969), school officials were enjoined from restraining publication in the school newspaper of a paid advertisement in opposition to the Vietnam War. The Zucker Court, like the Court in Bayer, rejected the defendants' argument that the newspaper was part of the curriculum and an educational device. The court held that "within the context of the school and educational environment, [the school newspaper] is a forum for the dissemination of ideas." Id. at 105. However, in Nicholson v. Board of Education, 682 F.2d 858 (9th Cir.1982), the right of school officials to exercise pre-publication review of a school-sponsored newspaper was upheld. The court reasoned, as follows:
Writers on a high school newspaper do not have an unfettered constitutional right to be free from pre-publication review. In fact, the special characteristics of the high school environment, particularly one involving students in a journalism class that produces a school newspaper, call for supervision and review by school faculty and administrators.
Id. at 863 (emphasis added). The significance of the cirricular aspect of the newspaper in Nicholson, was recently emphasized by the Ninth Circuit in Fraser, in distinguishing the student assembly in Fraser from the school newspaper in Nicholson, as follows:

Nicholson did involve the compulsory environment of the classroom. The publication of the newspaper was part of a journalism class in which students were being taught how to be journalists. As we explained, "[T]he school possessed a substantial educational interest in teaching young, student writers journalistic skills which stressed accuracy and fairness." ... Indeed, in Nicholson we explicitly pointed out that school officials had much greater latitude in reviewing a student publication that was part of the curriculum than in the case of a student newspaper that was an extra-curricular activity.
Fraser at 1364. (citation omitted).
In the case at bar, it is the opinion of this Court that Spectrum was an integral part of Hazelwood East's curriculum, as opposed to a public forum for free expression by students. See Findings of Fact No. 18. Several facts in this case lead directly to a finding that Spectrum "did involve the compulsory environment of the classroom." Fraser, at 1364. Spectrum was produced by members of the Journalism II class, which class was taught by a faculty member according to the Hazelwood East curriculum guide. See Findings of Fact No. 3. A textbook was used in the class, and a grade and academic credit was awarded for completion of the class. Id. The plaintiffs in this case, as well as other members of Spectrum during the spring of 1983, received both a grade and academic credit for their work on Spectrum. See Findings of Fact No. 20. The curriculum guide of Hazelwood East described the Journalism II class as a "laboratory situation", and Spectrum was the laboratory exercise. See Findings of Fact No. 3. Spectrum's staff was essentially restricted to students in the journalism class, said class met regularly in a classroom to work on Spectrum, and the nature of the out-of-class work required for Spectrum was not substantially greater than that required in other courses taught at Hazelwood East. See Findings of Fact No. 4. Board Policy 348.51 stated that school-sponsored publications, of which Spectrum was one, were "developed within the adopted curriculum". See Findings of Fact No. 8. The amount of extra-duty pay received by Mr. Stergos does not indicate that his services in connection with Spectrum were in the nature of an extracurricular activity. See Findings of Fact No. 5. Finally, the most telling facts are the nature and extent of the Journalism II teacher's control and final authority with respect to almost every aspect of producing Spectrum, as well as the control or pre-publication *1466 review exercised by Hazelwood officials in the past. See Findings of Fact No. 4. That control was not exercised to any lesser extent with respect to the articles in question. See Findings of Fact No. 13. Plaintiffs' beliefs to the contrary were not credible. See Findings of Fact No. 9. All these facts, taken together, convince this Court that Hazelwood East did not create Spectrum as an open or public forum of free expression by its students.
Although Spectrum was an integral part of the Journalism II curriculum at Hazelwood East, it does not follow that school officials were completely free of constraints imposed by the first amendment. Kuhlmeier v. Hazelwood School District, 578 F.Supp. 1286, 1291 (E.D.Mo.1984). In the context of school-sponsored programs, as discussed supra, school officials still must demonstrate that there was a reasonable basis for the action taken, based on the facts before them at the time of the conduct in question. Frasca, 463 F.Supp. at 1052. In the case at bar, there were several articulated reasons that satisfy this standard and thus justified Mr. Reynolds' action. Under this standard, this Court accepts as true Mr. Reynolds' reasonable belief that he had to make an immediate decision and that there was no time to make modifications to the articles in question. See Findings of Fact No. 14. This Court also accepts as true, Mr. Reynolds' testimony that his objections were directed only to the article dealing with the personal accounts of three (3) pregnant Hazelwood East students and Sherri Gordon's story on the impact of divorce on children. See Findings of Fact No. 15. But for these limited objections, Mr. Reynolds would not have deleted the articles in question from the May 13, 1983 issue of Spectrum. Id.
First, with respect to the personal accounts of three (3) pregnant students, Mr. Reynolds' concern that the students' anonymity could be lost was legitimate and reasonable. It was based on objective facts, such as the small number of pregnant students at Hazelwood East and several identifying characteristics that were disclosed in the article. Such a loss of anonymity could have resulted in unwarranted invasions of privacy. This was not only a reasonable basis for Mr. Reynolds' conduct, but was also one of the bases mentioned by the Supreme Court in Tinker as justifying a prior restraint of student speech. Tinker, 393 U.S. at 513, 89 S.Ct. at 740. ("invasion of the rights of others"). In addition, the subjects of the three (3) personal accounts provided details about their sex lives and use or non-use of birth control methods. This aspect of the article renders Mr. Reynolds' action particularly justifiable. The presence of personal material concerning the subjects' sex lives exacerbated the harm that could result from their loss of anonymity. Further, this aspect of the article is analogous to the play "Pipin" in Seyfried, that was cancelled on account of its sexual content. Hazelwood East may properly prevent the publication of such material in its official school-sponsored newspaper to avoid the impression that it endorses the sexual norms of the subjects of the article. Seyfried, 668 F.2d at 216. More importantly, this Court credits the judgment of Hazelwood East officials that such material, especially in the context of a school newspaper produced by a journalism class, is not appropriate for some of Spectrum's readers, given their age and maturity. See Findings of Fact No. 19.
Second, with respect to Sherri Gordon's story on divorce, potential problems with invasion of privacy also justified Mr. Reynolds' conduct. Although Diana Herbert's name was going to be deleted in final form, Mr. Reynolds was not aware of this because he was given an uncorrected copy of the galley proofs and his conduct must be evaluated according to the facts known to him at the time he acted. See Findings of Fact No. 14. The quote attributed to Miss Herbert revealed several "facts" about her parents. Aside from the fact that Miss Herbert's quote is relevant only to the causes of her parents' divorce, as opposed to the impact of their divorce upon her which impact was supposed to be the focus of the article, there is no indication in the *1467 article that her parents, especially her father, were given any opportunity to respond or rebut her allegations. Thus, there is serious doubt that the article complied with the rules of fairness which are standard in the field of journalism and which were covered in the textbook used in the Journalism II class. See Findings of Fact Nos. 12, 17.
These reasons amply justified Mr. Reynolds' actions. The facts that a large banner advertised the general topics to be covered in the May 13, 1983 issue and that Mr. Reynolds undoubtedly saw said banner several days prior to his conduct, merely demonstrates that Mr. Reynolds did not, as a matter of principle, oppose discussion of said topics in Spectrum. His objections legitimately went to the manner in which two (2) of the topics were handled. His objections were not pretextual. Accordingly, plaintiffs' first amendment rights, to the extent they applied to Spectrum, were not violated.
This Court is also convinced that defendants' conduct with respect to the May 13, 1983 issue of Spectrum did not "so chill the school's atmosphere for student ... expression that they cast a pall of orthodoxy over the school community,...." Seyfrield, 668 F.2d 216 (citation omitted). Several copies of the articles in question were circulated in xerox form at Hazelwood East subsequent to May 13, 1983. See Findings of Fact No. 21. Moreover, no efforts were made by defendants to stop said circulation or to punish the individuals responsible therefor. Thus, defendants did not attempt to quash discussion of the topics in question. Defendants merely exercised their discretion, in a proper manner, with respect to a product of the Hazelwood East curriculum.
Plaintiffs request that this Court invalidate the various regulations and policies developed by defendants to deal with student expression in the District's schools. Plaintiffs argue that defendants' conduct herein was not based on adequately clear guidelines; and that Board Policies 348.5 and 348.51, the Curriculum Guide for Journalism II, and Mr. Reynolds' pre-publication review policy were unconstitutionally vague. However, the cases relied on by plaintiffs involved regulation of private student expression or student expression within the context of school-sponsored public forums of free expression. The full panoply of precise substantive and procedural regulations is not required within the context of a program that is an integral part of a high school's curriculum. That is what is meant by the rule that school officials have a great deal of discretion in the realm of curriculum. Thus, plaintiffs' request is not well-taken under the facts of this case.
In conclusion, this Court holds and declares that plaintiffs' first amendment rights were not violated when defendants prevented the publication of the articles in question in the May 13, 1983 issue of Spectrum.
NOTES
[1] Plaintiffs' original complaint also sought injunctive relief. However, by this Court's Order and Memorandum of November 2, 1984, plaintiffs' claims for injunctive relief were dismissed on the ground that said claims were mooted by plaintiffs' graduation from Hazelwood East High School. Kuhlmeier v. Hazelwood School District, 596 F.Supp. 1422 (E.D.Mo.1984).